**Joseph STERNBERGER, Trustee in Bankruptcy for Spenco, Inc.**

v.

**The UNITED STATES.**

**No. 223–60.**

United States Court of Claims.

Oct. 18, 1968.

Frederick D. Sarkis, Philadelphia, Pa., attorney of record, for plaintiff.

Edward Weintraub, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner David Schwartz with directions to make findings of fact and recommendation for conclusions of law under the order of reference and the rules of the court. The commissioner has done so in an opinion and report filed August 16, 1968, on plaintiff's assignment of errors, under Rule 99(c).* Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the rules of the court has expired. Since the court agrees with the commissioner's opinion, in which necessary facts and recommended conclusion of law are stated, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case, without oral argument. Therefore, plaintiff's assignment of errors by the Board of Contract Appeals is denied, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

### SCHWARTZ, Commissioner:

The plaintiff is by suit in this court for breach of contract in effect seeking review of the decision of the Armed Services Board of Contract Appeals awarding him $5,161.88 on his claims for some $60,000 under a standard disputes clause in plaintiff's 1955 contract with the Navy. (The contractor-claimant before the Board will be treated interchangeably with its trustee in bankruptcy, the substituted plaintiff.) Plaintiff's assignment of errors by the Board is in substance a motion for summary judgment under Rules 94–100, and this opinion reports determinations and conclusions of law pursuant to Rule 99(c).

The contract was one for the production of a quantity of gun chargers and extra parts, at a fixed price of $83,510.91. Plaintiff sought costs attributable to a partial termination for the convenience of the government; costs of delays from alleged double inspection by the government, said to be a change under the changes clause; costs of allegedly improper inspection and rejections; and finally, costs of extras arising out of changes in the specifications. The Board held claimant entitled to an equitable adjustment of $232.83 on the claim for costs resulting from partial termination for convenience by reason of the government's failure to order the spare parts contemplated by the contract, and an equitable adjustment of $4,929.05 for the remaining claimed costs and extras.

The questions in dispute in this court concern only the amount of the awards. The contention, presented by plaintiff's assignment of errors committed by the Board, is that the Board decision is not supported by substantial evidence and thus not entitled to finality under the Wunderlich Act, 41 U.S.C. § 321. Plaintiff prays that the Board decision be held not binding, that the claims to costs in addition to those awarded be upheld, and that the case be remanded to the Board for negotiation of damages.

The first challenge to the Board's decision is based on the omission of the government to present any witnesses on the issues of damages. The plaintiff urges that its evidence of damages and its claim for $60,000 were thus uncontroverted, and that the award may therefore not vary materially from the amount of the claim.

Plaintiff took the position, before the Board, that it could not show precisely the costs incurred as the result of the several government actions complained of, and it thus sought what it termed a "jury verdict" by the Board upholding a claim for the total costs of the alleged

---

\* The procedure under which the case was submitted, assignment of errors, has been superseded by Rules 94–100. The report is therefore submitted pursuant to Rule 99(c). The necessary facts and recommended conclusion are stated in the opinion.

combined government delays and extras. Plaintiff's evidence primarily took the form of an overall presentation, primarily presented through an expert witness, of what its costs should have been and what they actually were. The entire difference of $60,000 between estimated and actual costs (both estimates) was attributed to the government's termination, delays, changes and extras. Plaintiff has thus combined the "jury verdict" approach to damages with the "total cost" method for the determination of damages, both discussed recently by this court in WRB Corporation et al. v. United States, 183 Ct.Cl. 409, 425–426 (1968).

■ Both "jury verdict" and "total cost" standards are not favored, and are permitted to be used to compute damages only upon strict conditions, recently stated by the court in *WRB Corporation* et al., supra. Some of these conditions are that the nature of the losses must be such that they cannot be determined with reasonable accuracy; that a showing must be made that the bid—the basis for the estimate of what costs should have been—was realistic; that the actual costs must be reasonable; and, finally, that the additional costs must be attributable only to the government's changes and delays. These conditions are no more than just if the contractor is to meet his "essential burden of establishing the fundamental facts of liability, causation, and resultant injury." Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968, 173 Ct.Cl. 180, 199 (1965).

Little if any effort was made to meet these conditions, and such testimony as was given does not meet any of them. The Board justifiably found fault with such evidence as was presented.

Proof of damages or costs was made by testimony of the president of the contractor at the time of performance of the contract, by testimony of the mentioned expert on damages and by a "Summary of Claim" prepared by a certified public accountant.

The president's testimony was general and imprecise. Where it verged on the specific it was in response to leading questions, and entitled to and given little weight.

The expert, an industrial consultant who had made a study of the contractor's costs and operations, testified at some length. He identified various exhibits and schedules embodying his analyses of costs, as the basis for his various intermediate and ultimate conclusions. He had, he said, relied upon records of the company, conversations with the president of the company, figures he had received from others as derived from the books, and on his own experience and background. He had relied, at least in part, on correspondence files which were not part of the record, on the experience of the president and others not named, on various estimates, and on "the experience of the people who made the estimate, which includes myself." He identified work papers as prepared by him but "not necessarily" in his writing. He had included a profit figure of 12 percent "mainly because the president had established this in some little document I had seen somewhere relative to this case." Some of his exhibits, as will appear below in discussions of individual awards, contained errors in arithmetic and errors in their summary of the underlying data. In one case, the underlying data was directly contrary to the point made in his summary. In others, increases in cost for a small number of the required parts were assumed to be an increase for every such part. The Board found his testimony "so inaccurate and so grossly exaggerated as to make it unreliable."

The "Summary of Claim" by the accountant served primarily to detract from the expert's testimony. It could not offer any basis for an award in the amount it claimed, for it was brief, undocumented, and conclusory rather than explanatory. Its author did not testify and it appeared that he had apparently proceeded on theories quite different from those of the expert. One example relates to "captive plant loss," for which the accountant's report claimed $21,067.-17. The expert made no such claim.

"Captive plant loss" was composed in part of overhead, and yet the accountant's report also claimed overhead and costs of administration as such. Another example has to do with an element of overhead, according to the accountant, of several thousand dollars "for authorized but undrawn salary" of plaintiff's president. No such item appears in the expert's estimates.

Although the expert testified that he was in part relying on the accountant's report, the two differed in their computations of the same item. The accountant's summary claimed that contemplated labor costs were $8,600, while the expert testified that they were $5,550.12. Actual labor costs over 29 months were given as $11,579.15 by the accountant, while the expert gave them as a lesser sum—$11,-075.37—over a period of 30 months. Their choice of slightly different periods in which labor was expended on the contract in question is another point of variation. Extra costs for parts required by the government's changes were stated to be $137.45 by the accountant, and by the expert's testimony were either $2,-846.40 or nothing.

The greatest difference between the two was in their overall conclusion. The accountant's "Summary of Claim" gave the total claim as $29,710.39. The expert estimated the contractor's actual costs to have been $102,700.34 and his estimated costs to have been $57,159.63. Though the difference between these actual and estimated costs is $45,540.71, the witness' opinion and testimony was that the costs attributable to the government's delays and changes were "something between $50,000 and $60,000."

The Board in its opinion noted some of these and other defects and contradictions in the testimony. It considered a remand for negotiation of damages, and, if negotiation failed, the presentation of more relevant evidence, but it concluded that the parties were unlikely to agree and it doubted that more relevant evidence could be presented. It concluded that the contractor had in large part not linked proof of costs or increased

costs to those specific delays or changes which it ruled had occurred. In some cases, on culling the evidence, the Board found that on the proof it could make an award, and it did so, in the total amount of $5,161.88.

■ The contractor, having solicited a "jury verdict" on self-contradictory and otherwise noncompelling testimony, is under a heavy burden in its present effort to upset that verdict. It has not met this burden.

■ It has failed to show the prerequisites for application of the "total cost" method. It has failed to show that the evidence which it presented and which the Board rejected was either uncontradicted or, more important, substantial in the sense of deserving of weight or acceptance. The fact alone that the government presented no witnesses does not make plaintiff's evidence compelling or substantial. The testimony said to have been rejected as uncontradicted was in part contradicted, and in part self-contradictory. The witness in question was moreover an expert giving opinion testimony. Even uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive. Cf. Dayton P. & L. Co. v. Public Utilities Commission, 292 U.S. 290, 299, 54 S.Ct. 647, 78 L.Ed. 1267 (1934) (citing cases).

■■ "The substantiality of evidence must fairly take into account whatever in the record detracts from its weight." Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted nonopinion testimony. Quock Ting v. United States, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L.Ed. 501 (1891); Duwamish et al. v. United States, 79 Ct.Cl. 530, 576 (1934). Such testimony, in Judge Hutcheson's words, "carries its own death wound." N.L.R.B. v. Robbins Tire & Rubber Co., 161 F.2d 798, 800 (5th Cir.

1947). Some of the defects and inconsistencies in the testimony have already been recounted above. Others will appear below in the disposition of the several assignments of error by the Board. Lastly, the evidence rejected was the testimony of claimant's expert witness and the decision appears to have been in part a judgment on credibility. This court normally defers to the judgment of the Boards of Contract Appeals on the credibility of witnesses who have testified before them, at least in the absence of contradictory uncontrovertible documentary evidence or physical fact, or studied arbitrary design, not here present. Williamsburg Drapery Co. v. United States, 369 F.2d 729, 733, 177 Ct.Cl. 776, 783 (1966); Carlo Bianchi and Company, Inc. v. United States, 167 Ct.Cl. 364 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965). See Jaffe, Judicial Control of Administrative Action (1965) 605–10. Accordingly, no error has been shown in the Board's rejection of the claimant's evidence as showing "total costs" or in the variance of the amount of the award from the single total amount testified to by plaintiff's expert witness.

█ If the Board is not to be required to accept plaintiff's evidence in toto, then plaintiff's next charge is that it was denied a fair hearing because the Board member who heard the testimony did not write the Board's opinion. Plaintiff attributes a rule of law that "The one who decides must hear." to Morgan v. United States, 298 U.S. 468, 481, 56 S.Ct. 906, 912, 80 L.Ed. 1288 (1936). The words quoted from *Morgan* are not a rule of law but an epigrammatic summary of a passage of the opinion holding that the officer charged with the duty of decision must consider the evidence. The Supreme Court explicitly noted that its decision was not to be taken technically and that evidence might be taken by a subordinate officer so long as it was appraised by the officer making the determination. Here, all three members of the panel of the Board concurred in the opinion which was written by a member other than the one who conducted the hearing. No claim has been made that the members who wrote and concurred in the opinion, and thus made the decision, did not consider the evidence. No rule of the Board requires the member who conducts the hearing to write the Board's opinion. There is no failure of due process in the assignment of only one member of the Board to preside at the hearing and the decision by three, including the hearing member, in an opinion written by a member other than the hearing member. Anthony P. Miller, Inc. v. United States, 161 Ct.Cl. 455, 474, n. 11, cert. denied, 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111 (1963); Sundstrand Turbo v. United States, 389 F.2d 406, 410, 182 Ct.Cl. 31, 38 (1968).

█ The government, too, has a contention going to the entire decision of the Board. The government would support the total award of $5,161.88 by pointing to the lesser amount for which the case was all but settled. Pending the proceedings before the Board, the contractor was adjudicated a bankrupt and its trustee in bankruptcy, the plaintiff in this court, was substituted for it as the claimant. At one point, the government's counsel and counsel for the trustee agreed to settle the claim for $3,052.72. The agreement failed to dispose of the case, however, for lack of explicit approvals by the trustee and the bankruptcy court, required by section 27 of the Bankruptcy Act (11 U.S.C. § 50). The Board accordingly denied the government's motion for decision in the amount of the settlement, and proceeded to try the case. The government does not contest this ruling, but suggests that the amount of settlement "at the very least is evidence of the reasonableness of the equitable adjustment exceeding that amount made by the Board after the hearing on the merits." The suggestion is unacceptable, even passing the question whether the settlement—not relied upon by the Board—was a part of the record to which review in this court is limited by United States v. Carlo Bianchi & Co., 373 U.S. 709, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963). Cf.

Universal Camera Corp. v. Labor Board, supra, 340 U.S. at 493, 71 S.Ct. 456 (1951). First, to rely on the amount of the aborted settlement would give some effect to a settlement held ineffective because of the positive requirements of the Bankruptcy Act, and thereby dilute the command of that Act. Moreover, the nature of the failure to meet the requirements of the Act destroys any evidentiary value of the settlement. An offer in settlement is ordinarily not admissible, for it is deemed to be an indication only of a desire for peace and not an admission. If the offer is accepted, however, and the agreement of compromise is for some reason not performed, by some authority —not all—the agreement is admissible. Annot. 26 A.L.R.2d 858 (1952). There is only scant authority on the subject of the admissibility of an agreement which has failed of performance because it is in law void. Ibid. at 867. The rationale of admissibility, whether of offer or agreement, is that the act is an admission by the party against interest. Purported admissions, in the course of compromise negotiations, by an unauthorized person such as a parent or a wife are therefore well understood not to amount to an admission of the party. 4 Wigmore on Evidence (3d ed. 1940), § 1061, pp. 29, 30, note 5. The failure of the instant agreement, for lack of ratification, to bind the trustee in bankruptcy prevented it from becoming an admission by the trustee, the party in interest against whom it is now being presented.

Plaintiff's first specific challenge to the Board's separate decisions is to the amount of the equitable adjustment awarded as increased costs as a consequence of the partial termination by the government, for its convenience, of the portion of the contract covering the purchase of spare parts. The parties do not controvert the findings that the government was obligated to buy spare parts, that it failed to do so and that the failure was a partial termination compensable under the termination-for-government-convenience clause contained in the contract. An equitable adjustment was therefore payable and the amount awarded is the issue.

The Board found that the contractor had incurred costs of $775 in preparation for the entire contract. It grounded its finding on a portion of the testimony of the contractor's expert witness on damages. This witness, stating his disagreement with claimant's president on the subject of costs in preparation for the contract (but not identifying the president's views), testified to five types of such "tooling" costs, to a total of $775. (An exhibit identified by him listed and added the five costs and showed a total of $775, which correctly added should have been $825, but the Board cannot be faulted for taking the figure given both orally and at the foot of the column in the exhibit.) The Board held 28.342 percent (the spare parts portion of the contract was $23,688.56 of a total contract of $83,510.91, or 28.342 percent) of $775, or $219.65, to be the amount of preparatory costs allocable to spare parts, and added $13.18 as a six-percent profit, making a total award of $232.83 as the increased unabsorbed costs resulting from the partial termination with respect to spare parts.

Plaintiff claims that the Board erred in awarding only a percentage of "special tooling" costs; that the termination-for-convenience clause requires the award of an overall increase, by reason of the termination, in the cost of producing the nonterminated portion of the contract. To the extent that the argument seeks to differentiate between costs of "tooling" and preparatory costs in general, the answer is the expert's testimony that by "tooling" costs he meant all preparatory costs. The Board actually did essentially what plaintiff claims it should have. The heart of the matter is the cost allocable to the terminated portion alone and not absorbed by the nonterminated portion. By plaintiff's view, these costs should be treated as an overall increase in the cost of producing the nonterminated portion of the contract, and then divided by the number of finished items delivered, the resulting figure be-

ing the increased cost of each item delivered under the nonterminated portion. Had the partial termination in fact reduced the number of finished items to be delivered, plaintiff's method would helpfully determine the increased cost from partial termination to be awarded in connection with each finished item. Here, however, the termination eliminated the entire unperformed section of the contract calling for spare parts and left intact the entire portion of the contract for finished products. The preparatory nonabsorbed costs with respect to the terminated portion, not absorbed by the nonterminated portion, thereby, became awardable as a lump sum, without any need for their distribution among the completed finished products. This was done, and no error was committed.

■ Plaintiff next more specifically disputes the correctness of the finding of the amount of the award for tooling. The increased costs from the partial termination, it is said, were actually $10,235. Plaintiff relies upon the testimony of the president of the contractor during the time of performance, as showing error in the Board's reliance upon the expert's testimony that tooling costs were $775. The president testified that in making the bid he allocated nine named costs— "pre-production engineering," "tooling" and others—to the spare parts called for in the invitation to bid. Seven costs, led by pre-production engineering, were alleged in the complaint before the Board. Their total was $39,750, of which 26 percent, or $10,235 ($10,335 if correctly computed) were alleged to be allocable to spare parts and to have been unabsorbed, following the partial termination, by the nonterminated portion of the contract. But the witness did not say that he was referring to the costs alleged in the complaint and he gave no dollar figures and identified no bid estimates or other writings. Further, in testifying to the percentage of the bid he had allocated to spare parts, he said: "It was 40 percent of the money value of three items which came out approximately 26 percent of the total contract." This testimony could

only serve to perplex. He failed to identify the "three items" of which he spoke or to distinguish them from the seven in the complaint or from the nine to which he had otherwise testified, and he did not explain the apparent contradiction in his reference to 26 percent. The price of the spare parts as stated in the contract was 28.342 percent of the total contract price. Apparently, however, the government was to have some leeway as to increasing its orders for spare parts, and the contract provided that spare parts were "not to exceed 40% of money value" of the finished products. The witness' use of a 40-percent figure might therefore be understandable, but not in combination with 26 percent (even if 26 percent were accepted as an approximation of the correct 28.342 percent) and certainly not without some explanation beyond that given. In any event, the witness testified to no dollar figures for the types of pre-production and other preparatory costs he did mention. There is nothing in his testimony, therefore, to support the claim to nonabsorbed preparatory costs of $10,235, whether as a percentage of a larger sum or otherwise, or of any other sum larger than the $232.83 awarded by the Board. Finally, the expert witness, in giving his testimony of preparatory costs of $775, said that he disagreed with the president on the subject of preparatory costs. In view of the nature of the president's testimony, that of the expert witness seems highly preferable. In any event, as already held above, the Board should prevail in its resolution of the conflicting testimony of the witnesses.

The Board made a single award of $4,929.05 for all other proven elements of the claim. This sum comprised $137.45 for extra parts required by the government, $2,475.37 for the labor costs of required extra work and $2,037.23 for overhead, to which the Board added $279 as a six-percent profit. While this award of $4,929.05 was given on unrelated claims, the proof of damages overlapped and the evidence supporting the entire award requires treatment as a

unit. Plaintiff disputes the amounts of costs found and awarded and also the failure to make awards of other costs claimed.

The first claim considered by the Board on this branch of the case was that the contract provided for inspection at the contractor's plant and that the testing at a naval testing laboratory of samples from each production lot was a change resulting in extra costs compensable by an equitable adjustment under the changes clause of the contract.

The contract provided for inspection of the manufactured products at the contractor's plant. In a clause entitled "Inspection," the contract provided, with respect to "all items" covered by the contract, that "complete inspection for conformance with the contract requirements and final acceptance will be made at contractor's plant or point of origin." The plant was located at Pendel, Pennsylvania, and inspection at the plant was to be made by personnel of the office of the Inspector of Naval Material at Upper Darby, Pennsylvania.

In another clause, express provision was made for testing pre-production samples at an Engineering Test Laboratory in Pittsburgh. This clause, entitled "Pre-Production Samples," provided that two pre-production samples were to be submitted to the Laboratory, via the Naval Inspector, transportation charges prepaid. They were to be preliminarily approved by the Naval Inspector and then sent to the Engineering Test Laboratory at Pittsburgh for final approval. Production was not to begin until they had been approved.

Production samples were also to be tested and as noted the issue is the extra costs resulting from their testing. A clause entitled "Samples for Testing" provided for the selection from each production lot, according to size, of a number of "test samples" ranging from one to six. These were to be supplied by the contractor in addition to the contract quantity, without cost to the government,

and were to be considered the property of the government. No reference appears, as in the clause concerning pre-production samples, to a place at which they would be tested. All the foregoing clauses appeared in the invitation and bid, and all were of course custom-made for this contract. In the course of performance, samples from each production lot (that is, not pre-production samples) were in fact sent for testing to the same laboratory as tested the pre-production samples, with alleged resulting delays in plaintiff's performance.

A last relevant clause is the standard clause for supply contracts dealing with "Inspection," incorporated in the invitation by reference. It subjects all supplies, including end products, "to inspection and test by the Government, to the extent practicable, at all times and places."

The plaintiff claims that production lot samples should have been tested at its plant, pursuant to the clause for inspection there of "all items" of manufactured products. The question thus is whether production lot samples could permissibly have been tested at the Pittsburgh laboratory, as were the pre-production samples, without government liability for a change. The Board did not decide the question, for in dealing with questions of costs, it found no evidence that testing in Pittsburgh, if it were a change, resulted in extra work or unreasonable delay. If a decision were required, it would be difficult, merely because the "Samples for Testing" clause does not explicitly mention a place of testing, to restrict the government to testing of production samples at the contractor's plant.

 Production samples were described as samples to be tested; they were "Samples for Testing" and, again, "test samples." They were to be supplied in addition to the contract quantity, and thus distinguished from the production lot itself, which was to be inspected at the plant as a final matter. Testing was distinguished from inspection. In

the case of pre-production samples, testing was to be performed at the laboratory in Pittsburgh. It would be reasonable to infer that testing was to be a matter different from inspection and could not practically be performed at the plant or elsewhere than in a specialized laboratory. With due deference to the principle that ambiguity in contracts written by the government is resolved in favor of the contractor, the contractor could not reasonably have felt either that testing was the same as inspection or that testing of production samples would take place at the plant.

■ The Board found that the testing in Pittsburgh, in and of itself, did not require anything extra to be done by the contractor, and that the claimant had presented no proof of any extra costs or of any burden. As to delays by reason of the testing at the laboratory in Pittsburgh, the time lapses between shipments of samples and notification of results of testing ranged from 6 to 31 days. Plaintiff combines these periods to claim a delay of 344 days or almost a year. Where a sample is accepted or rejected within a reasonable time, the days comprising reasonable periods may of course not be aggregated into a single large period and thereby made into an unreasonable delay. The Board found the separate time lapses not to be unreasonable, and plaintiff suggests nothing which might make this conclusion doubtful. Plaintiff fails in its renewed contention that in one case the delay was 80 days. The 80 days appeared on a tabulation presented by its expert witness, with a citation to an underlying exhibit. On examination, the exhibit shows that the sample was mailed August 29, 1957, and contractor was notified of acceptance 19 days later, on September 17, and not, as claimed, 80 days later, on November 17, 1957. The single claim of possible unreasonable delay thus fails for lack of proof, and the finding of the Board rejecting the claim that testing in Pittsburgh caused unreasonable delay is well supported by the evidence.

Next is a claim that the tests at the Pittsburgh laboratory were faulty and resulted in improper rejections of some test samples. The claimant's president testified to this effect, without contradiction, and the Board held this claim to be a change entitling the contractor to an equitable adjustment in a proven amount. Again, however, proof of costs was missing. The president testified that the samples improperly rejected required disassembly and retesting at the plant, and that this took an hour and a half per sample. But he gave no testimony on the cost of the disassembly and retesting or on the number of samples involved. His bare reference, in the course of his testimony, to one production lot as containing 299 pieces was given in response to a leading question and was insufficient for a finding that 299 units were improperly rejected or were unnecessarily required to be disassembled and retested. The Board therefore properly concluded that it had no evidence upon which to ground an award for increased costs from improper testing or rejections.

Any such costs as may have been incurred were nevertheless awarded, for in upholding the contractor's next claim, to an admitted change calling for extra parts not required by the specifications, the Board awarded all costs of extra labor and parts as to which there was acceptable evidence in the record. This award, now to be discussed, compensated plaintiff for increased costs, if any, from faulty testing or rejections of samples, and indeed, from the testing in Pittsburgh, faulty or not.

The government did not dispute that the contractor had been directed to add to the product certain parts not originally specified, and that an equitable adjustment was payable for this change. The president testified that these extra parts were a certain ring, a plug and a safety wire, and that the total cost of the labor and materials involved was $3,000. The Board awarded $137.45 for the parts themselves, on the basis of a statement in the public accountant's "Summary of

Claim." The expert did seem to have considered the cost of the precise specific rings, plugs and wire involved, multiplied by the almost 1,900 items delivered under the contract. Indeed, his supporting data, introduced into evidence, did not show that any extra parts were added. He testified to an increase of $2,-846.40 in the cost of parts by reason of the goverment's acts, this sum being the difference between $44,813.40, his estimate of actual costs, and $41,967, his estimate of what costs should have been. His testimony and exhibits, along the lines of his "total cost" approach, proceeded on the theory of a rise in the prices, during the claimed period of the government's delays, of certain of the parts comprising the product. Even if his theory of attribution to the government of all increased costs were acceptable, his data was not. Six parts in the product were said to have been increased in price and the supporting documents consisted of orders or quotations for the six parts both at the earlier, lower, and at the later, higher prices. The increases in price were then multiplied by 1,900 (though the contract called for 1,873 finished products). In several cases, however, the order and quotations were for too few a number of parts to support a conclusion as to the cost of 1,900 units. His testimony was rejected, with good reason, both for failure to focus on the extra parts actually involved in the change and for insufficient support by such documents as were presented. The Board's finding of $137.45, on the other hand, was substantially supported by the "Summary of Claim" by the claimant's accountant. That report identified the very parts named by the president as added, and gave their cost precisely.

The Board withheld entirely an award for outside services. The expert's evidence, on the same theory as that offered to show increased costs of extra parts, purported to show an increase from fifty cents to seventy-nine cents in the cost of chromeplating one part. The price quotations offered in proof, however, showed the opposite, that is, a decrease from seventy-nine cents, and thus an economy to the contractor by postponement of his procurement.

Extra costs of labor were awarded, in the amount of $2,475.37. Competing figures were, again, offered by the expert witness and the accountant. The expert testified to increased labor costs of $5,-525.25, the difference between actual labor costs of $11,075.37 and estimated costs of $5,550.12. The accountant's report gave actual costs of $11,579.15, and estimated costs as $8,600. The Board accepted the expert's version of actual costs, $11,075.37, and the accountant's version of estimated costs, $8,600, and awarded the difference, $2,475.37, as the increase in labor costs. Plaintiff challenges this finding as inconsistent and erroneous. The inconsistency was rather that of the plaintiff's witnesses, who testified contradictorily. The testimony of both expert and accountant was substantially similar on actual labor costs, and the plaintiff's real grievance is against the Board's preference for the accountant's estimated costs of $8,600 over the expert's estimate of $5,550.12. Both figures were undocumented. The $5,550.12 estimate by the expert was based on the expert's estimate and judgment on the set-up and run-time for each manufacturing operation. Since his testimony had been found erroneous and exaggerated in several respects, it cannot be said that the Board acted unreasonably in withholding credence from his conclusion. This was the only challenge to the award based upon the accountant's figures, and the contention fails.

Going on to overhead, the Board found that it should be computed as 82.3 percent of the $2,475.37 determined to have been cost of extra labor, and awarded this percentage, or $2,037.23, on account of overhead. Plaintiff claims an additional sum of $21,067.17, referred to only in the accountant's "Summary of Claim" and there called "captive plant loss." The accountant did not testify and his summary did not explain the rationale of

the computation of "captive plant loss" or its elements. The Board would make no award for "captive plant loss," in the belief that its essence was a second payment for overhead. The nature of the "Summary of Claim," taken together with its author's failure to testify, provides substantial support for the Board's refusal.

■ The $137.45 award for materials, the $2,475.37 for labor, and the $2,037.23 for overhead came to $4,650.05, to which the Board added six percent or $279 for profit, making a total of $4,-929.05 on this second and final branch of the case.

In conclusion, there is no merit to any of plaintiff's contentions that findings of the Board are without support by substantial evidence. These findings are therefore under the Wunderlich Act final and conclusive against the claims made in the petition in this court, and the petition should be dismissed.

It is recommended that plaintiff's assignment of errors by the Board of Contract Appeals be denied and the petition be dismissed.