**BLOUNT BROTHERS CORPORATION**

v.

The **UNITED STATES.**

No. 158–67.

United States Court of Claims.

April 17, 1970.

challenges the adverse decision of the General Services Administration Board of Contract Appeals [1] on a claim which plaintiff brought on behalf of its pile driving subcontractor, D. A. Foster Equipment Corporation (hereinafter for convenience referred to interchangeably with Blount Brothers Corporation, as plaintiff), under the changed conditions provisions of the contract for $165,988.-57 extra costs which plaintiff contends were incurred because the soil conditions substantially differed from those represented on the boring logs and other contract documents.

■ A threshold question is presented by defendant's position, which it asserted before the Board and now asserts in this court, that plaintiff's suit is barred because it did not give prompt written notice of the alleged changed condition as required by the contract. [2] Defendant's position must be rejected, however, since both the contracting officer and the Board considered plaintiff's claim on the merits without any point being made as to lack of such notice. [3] Morrison-Knudsen Co. v. United States, 397 F.2d 826, 848, 184 Ct.Cl. 661, 697 (1968); Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 668, 182 Ct.Cl. 507, 511 (1968); Fox Valley Engr., Inc. v. United States, 151 Ct.Cl. 228 (1960); Ar-undel Corp. v. United States, 96 Ct.Cl. 77, 111 (1942).

The contract called for the driving of both bearing (foundation) piles and sheet piles (for lateral earth support) and provided for an adjustment in contract price if the total linear footage of the piles as installed and approved was greater or less than shown on the drawings. It required prior approval of certain data by defendant pertaining to the pile driving hammer which the contractor proposed to use; that "piles shall be driven with a hammer capable of delivering not less than 15,000 foot pounds energy per blow"; that certain driving leads should be used to keep the hammer firmly in position and alignment; and that "introduction of additional materials or the use of wood chips, small blocks, shavings or similar materials to cushion hammer blows will not be permitted." It provided that "penetration to rock elevations shall be obtained without pile distortion or damage"; that certain test bearing piles should first be driven "to the highest permissible tip of elevation noted on the drawings or deeper, to obtain a maximum penetration of 0.25 inch in last five blows"; prescribed a load test; and further provided that the test results would be analyzed to establish driving methods and

---

1. GSBCA-1385, dated June 28, 1966 (66-1 BCA ¶ 5652).

2. Article 4. Changed Conditions of the General Provisions (Construction Contract), Standard Form 23-A, General Services Administration:
"The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (a) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (b) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required; or unless the Contracting Officer grants a further period of time before the date of final payment under the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 of these General Provisions."

3. In its opinion, the Board stated:
 * * * * *
"The Board passes over and makes no ruling on the question of Appellant's failure to notify promptly the Contracting Officer of changed conditions, although this point was strongly argued by the Government on brief. That point being procedural, the Board will move to the more substantive aspects of the dispute."
 * * * * *

final penetration for contract pile work, and that "driving of the remainder of the piles shall not be done until the Contracting Officer confirms specification requirements, or adjusts them on the basis of test results."

Paragraph 8–11, of the specifications, entitled "Driving Foundation Piles" read in pertinent part:

a. The remainder of the foundation piles shall be driven at least to the highest permissible tip elevations indicated on the drawings or deeper if necessary to attain minimum number of blows required for the final foot of penetration as established by the test piles as specified.

b. In the event that "Unusually high resistance" to driving is encountered above the highest permissible tip elevation, piles may be stopped at a higher elevation providing the pile tip is not stopped more than 5 feet above the highest permissible tip elevation indicated on the drawings.

"Unusually high resistance" is defined as a resistance in any one foot of stratum 5 feet or less above the highest permissible tip elevation that exceeds by 20 percent the blow requirement established by the test piles as specified and the blow count for the three preceding feet above the one foot high resistance stratum must have averaged at least 75 percent of the blow requirement established by the test piles as specified.

c. Tops of pile shall be cut off at elevations indicated on drawings.

Paragraph 8–15 of the specifications, entitled "Sheet Piling" read in pertinent part:

c. Steel sheet piling shall be driven with approved equipment suitable for the work. Due care shall be exercised to maintain verticality of the piling. Location and any deviation from the vertical shall be accurately measured; sections deviating from plan location by more than 3 inches or out of vertical to the extent that the bottom of the section would be out off

[sic] plan location by more than 3 inches shall be withdrawn and re-driven at no additional cost to the Government. Piling shall be driven into rock where called for on the drawings and to the depths shown in other locations. The Construction Engineer may direct a greater depth than assumed rock elevation if necessary or lesser depth if piles are seated in rock above plan depth in which cases adjustments in the contract prive [sic] will be made as specified. Steel sheet piling extending above the cut-off elevations shown shall be cut or burned off square at the elevations shown. All steel sheet piling shown on the drawings shall be left in place.

As heretofore indicated, the contract was entered into on April 25, 1963. On May 6, 1963, plaintiff submitted to defendant technical data on a new Delmag Diesel Pile Hammer which had been just purchased and was to be first used on the contract job. The data recited that the hammer had 22,500 foot pounds energy per blow. On May 14, 1963, defendant approved the Delmag hammer for use for driving both bearing and sheet piles.

On or about June 6, 1963, the driving of the sheet piles with the Delmag hammer commenced at the "upper area" of the project. The driving was hard and on June 28, 1963, defendant's construction engineer directed that where the sheet piling was driving 25 blows to the inch, provided that there were 5 feet of toe-in (projection below the adjacent excavation), the hammering could stop and the depth attained would be acceptable to the Government.

On June 19, 1963, plaintiff submitted to defendant a manufacturer's bulletin on a Vulcan No. 1 hammer and requested that it be approved as a second pile driving hammer for the job. Plaintiff stated that it would like to drive a test pile with each hammer so it could either use both hammers to drive piles or have a standby in case of breakdown. The bulletin recited that the hammer had 15,-

000 foot pounds energy per blow, that it was one of the most successful of all hammers for difficult driving, due to the fact that it had "a heavy ram striking the pile with a low velocity," and that the same energy in a hammer of high velocity was often needlessly wasted during the impact period. On June 24, 1963, defendant approved the Vulcan No. 1 hammer for use as a second pile driving hammer.

On July 12, 1963, the driving of the sheet piling in the "upper area" was completed, and on that date the first test pile (in connection with the bearing piling) was driven with the Vulcan No. 1 hammer. The test proved unsuccessful because the pile failed to sustain the required load. During July 16, 17, and 18, 1963, a second test pile was driven with the Vulcan No. 1 hammer until the pile tip reached refusal and then driving was continued with the Delmag hammer which drove the pile to 30 blows per inch. Load tests proved satisfactory at the elevation reached which was 6.5 feet above minimum specified tip elevation. On July 22, 1963, a third test pile was driven with the Vulcan No. 1 hammer (with wood chips) to a tip elevation of 374.50 with 30 blows per inch, and then driving was continued with a newly acquired McKiernan-Terry hammer (rated 16,000 to 22,400 foot pounds energy per blow) to a tip elevation of 372.50 with 30 blows per inch.

On August 5, 1963, the acting chief of defendant's design and construction division sent plaintiff a letter which read in pertinent part:

Recent observations of your pile driving operations indicate that due to site conditions certain changes in the procedure required by the contract are desirable.

Accordingly, you are requested to drive the piles to the point where 25 blows per inch for the last three (3) inches is obtained with the 22,500 foot pound hammer.

During the driving operations, plaintiff experienced hard driving, breakdown of equipment (although the reason for the breakdown is in dispute), and fell behind schedule and was compelled to work additional shifts. On August 13, 1963, both the bearing and sheet pile work were completed.

By letter of October 30, 1963, plaintiff wrote to defendant in pertinent part:

Paragraph 8–04(c) of the contract specifications indicates that an equitable adjustment shall be made in the contract amount if total linear footage of bearing piles or total extent of steel sheet piling deviates more than 10 per cent from the quantities shown on the drawings. Our records indicate that total linear footage of bearing piles was approximately 24 per cent less and total extent of steel sheet piling was approximately 18 per cent less than shown on the drawings. * * * In establishing an equitable adjustment, we believe the following items should be considered:

1. Due to irregular and uncertain soil conditions encountered, locations of test piles were changed and there was some question as to how many load tests would be required, which disrupted our operations to some extent.

2. Steel sheet piling encountered irregular rock formations and considerable time was spent trying to penetrate the rock after practical refusal had been reached.

3. Specifications require that control test piles be driven to a maximum penetration of 0.25 in. in last five blows with a hammer capable of delivering not less than 15,000 ft. lbs. energy per blow. After studying results of load tests, you requested in a letter dated August 5, 1963 that we drive bearing piles to 25 blows per in. for the last 3 in. with a 22,500 ft. lb. hammer. This, of course, was considerably harder driving than we had anticipated at the time of bidding, and greatly increased the time required to

complete this work, and consequently increased our costs.

4. So that there would be no delay in waiting for materials, we purchased the full quantities of "H" piles and sheet piling indicated on the contract drawings, and after making cut-offs, handling, and hauling the short pieces of material, the net scrap value was negligible.

In view of the above, we request that you accept a credit of $200.00 for this deviation in quantity from that shown on the contract drawings, and that we be granted a 21-day time extension to compensate us for the time lost due to the changes necessitated by these unforeseen conditions.

On May 15, 1964, plaintiff withdrew the foregoing letter of Ocober 30, 1963, and on May 25, 1964, plaintiff wrote defendant requesting that a change order be issued in the amount of $202,-786.31 for "additional work required to complete the piling," and that plaintiff "be granted a 21-day time extension for the delays resulting from this changed condition." On August 7, 1964, plaintiff submitted a "revised claim in the amount of $165,988.57 for additional work encountered when driving Sheet and Bearing Piles." On September 8, 1964, the contracting officer rejected plaintiff's claim, but established $6,619 as an equitable adjustment to the contract. Evidence before the Board was to the effect that this amount represented compensation for the driving of bearing piles in excess of contract requirements, for the driving of an extra test pile, and also satisfied the credit due the Government for the underrun of sheet and bearing piling.

Plaintiff's position is, in substance, premised on the following propositions: (1) that the test borings were inadequate and the borings and drawings did not reflect actual site conditions which differed materially from those indicated in the contract, (2) that although the specifications indicated that the piles could be successfully driven with a 15,-000 foot pound hammer and although defendant approved the use of the Vulcan 15,000 foot pound No. 1 hammer, neither it nor the other hammers delivering greater energy, approved for use by defendant, could drive the piles to the prescribed elevations, and (3) that the June 28, 1963, directive by defendant's construction engineer (above referred to) and defendant's letter of August 5, 1963 (above quoted), constituted a recognition by defendant of a changed condition.

In considering plaintiff's position we start with the familiar general legal principles that (1) where the question presented is one of simple fact arising under the Changed Conditions article, the Board's decision thereon, unless it is fraudulent or capricious or arbitrary or so grossly erroneous as to imply bad faith, or is not supported by substantial evidence, is entitled to finality, (2) that where the ultimate determination of liability turns on the proper legal standard to be applied under that article, a question of law is presented which this court is free to answer independently of the Board's decision and (3) that substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, after taking into account the record as a whole. Perini Corp. v. United States, 381 F.2d 403, 180 Ct.Cl. 768 (1967); Koppers Co. v. United States, 405 F.2d 554, 186 Ct.Cl. 142 (1968); Woodcrest Constr. Co. v. United States, 408 F.2d 406, 187 Ct.Cl. 249 (1969), cert. filed, July 28, 1969.

(1) Borings and Drawings—Prior to the formulation of plaintiff's bid, the Government boring logs and piling plans and details were examined by plaintiff. The pile notes stated that the design load per pile was 95 tons, that the piles were to be driven to practical refusal (to penetrate further) at the boring elevation indicating rock and that the aggregate bidding length of all bearing piles was 12,-550 feet. The bearing pile schedule provided that the pile points given were for bidding purposes only and that the con-

tractor "shall drive all piles to refusal as defined in the specification." The boring logs revealed the top of the weathered in-place schist (rock) at 372 feet elevation, the top of sound rock at 370 feet elevation, with the hardness of the rock increasing with the depth thereof. The piles were actually driven an average of 371.3 feet which were roughly seven feet above the design tip elevation. As installed, the total footage of the bearing piles was approximately 24 percent less and the total footage of the sheet piles was approximately 18 percent less than shown on the drawings.

At the Board hearing, plaintiff's expert witnesses testified in effect that there had been an insufficient number of test borings and that the boring logs and drawings indicated a "decomposed schist" at certain elevations; that some decomposed schist is hard and some is soft, but that the load tests revealed that all of the decomposed schist was hard in that it actually had the characteristics of rock; and that given the depth to which it was proposed in the specifications that the piles were to be driven, an expert soil engineer could not have been sure that the piles could not have been driven to such depth.

Defendant's expert witnesses, on the other hand, testified in effect that the boring logs and drawings described the site conditions fully and completely as they were actually encountered at the site and that such logs and drawings indicated that the driving would be "into rock" and very difficult; and that although plaintiff reached the point of "refusal" in its driving operations sooner than initially anticipated, it could not have been predicted from the boring data precisely where "refusal" would be reached.

In its opinion, the Board stated:

\* \* \* \* \* \*

As a changed condition, Appellant attempts to prove that the number of borings were inadequate for proper performance of the pile driving work. Testimony was received from Appellant that at least two more test borings would have been helpful. Here again we fail to perceive what significance this allegation has on the issue of changed conditions. An insufficient number of test borings would not amount to a change in physical conditions.

There was no evidence of a probative nature offered that the test boring data was inaccurate. A workman for the subcontractor testified that he encountered extremely hard soil a few feet below the surface, but there is no showing that the soil encountered was different than that shown by the boring logs. It appears undisputed that Appellant encountered extremely hard driving, but there is nothing in the record to support the contention that soil conditions were different than disclosed by the contract documents. In fact, Appellant's expert witness testified that he was unable to say that there was a difference between the contract documents and site conditions. Hard driving, *per se*, does not constitute a changed condition. Unrefuted testimony was received that certain strata shown by the boring logs indicated hard soil having the consistency of rock.

\* \* \* \* \* \*

Appellant proclaims the contract documents to be erroneous and misrepresents conditions at the site due to the fact that certain of the topsoil was found to be less abundant than shown by the boring logs data. Appellant called the situation to the Government's attention and suggested that the existing topsoil which had been stockpiled on the site be spread over the lawn areas, with finish grading, seeding and maintenance as specified in the specification. The Government approved the suggestion. No change in contract price was requested. Appellant also complains of errors in grade elevations as shown on the drawings. Testimony (unchallenged) was received that earth was deposited on the site between the time the drawings were prepared and the contract award-

ed. In any event, a change order was issued compensating Appellant for the removal of that deposit. The controlling question presented is: does a shortage in topsoil and a differential in grade elevation amount to changed conditions within the meaning of the changed conditions clause? We think not, particularly so when the dispute relates to pile driving. Under the circumstances of this appeal, it would be unrealistic to characterize these two situations as subsurface or latent conditions, or unknown conditions of an unusual nature. Moreover, even if judged a changed condition, Appellant was compensated for removal of the deposit of earth, and is now precluded from additional compensation for that work.

\* \* \* \* \* \*

█ It is concluded that the Board's ultimate finding on this issue is supported by substantial evidence, and is, accordingly, entitled to finality.

(2) Hammers—Plaintiff's witnesses testified that there was an inordinate amount of down-time because of pile and hammer damage caused by excessively hard driving, much of which was because plaintiff was required by defendant to hammer needlessly after its hammers had reached the point of refusal. Defendant's witnesses testified, however, that most of the hammer down-time was due to "dog latch" (tripping or triggering mechanism) difficulties which had no connection with hard driving, that the pile and hammer damage was not unusual for the hard driving which should have been expected and that defendant did not require hammering after refusal had been reached.

Plaintiff asserts that the requirement, contained in defendant's letter of August 5, 1963, that it use the 22,500 foot pound hammer for the last three inches, was an admission by defendant of plaintiff's contention, expressed by its witnesses, that the 15,000 foot pound Vulcan No. 1 hammer, previously approved by defendant, could not do the job.

Defendant offered the testimony of a foundations engineer who participated in the design of the foundation for the project and who visited the job site at the time the test piles were driven. He testified that he recommended that the Vulcan No. 1 hammer be used to "toe-in" (start) the piles because it had "fixed leads," required by the specifications, but that after the piles were some distance in the ground, the Delmag hammer which did not have fixed leads (for starting the pile in the ground), be used. The foundations engineer and the chief nuclear engineer of the National Bureau of Standards, Reactor Division, both testified in effect that the Vulcan No. 1 hammer could have successfully driven the piles but for the fact that wood chips (4 x 4 x 4 oak blocks) which plaintiff used in the hammer, cushioned the blows and reduced the energy per blow. Defendant points to the contract provisions requiring use of driving leads on the hammers and prohibiting the use of wood chips to cushion hammer blows.

█ The denial by the Board of plaintiff's contention is amply supported by the record.

(3) Defendant's June 28, 1963, Directive and Defendant's Letter of August 5, 1963—The Board stated:

\* \* \* \* \* \*

Much of the piling (both sheet and bearing) was not driven to anticipated elevations. A note on Drawing 7–2–1 recites that "Piles to be driven to practical refusal at the boring elevation indicating rock." There was an underrun in sheet piling averaging 18 percent and an underrun in bearing piling averaging 24 percent. Situations of this sort appear to have been contemplated by the parties at the time of entering into the contract as Section 8 clearly provides for an adjustment in contract price for overrun and for underrun (credit to the Government in case of underrun, credit to Appellant in case of overrun). A note on Contract Drawing 7–2–1 recites that the aggregate bidding length of all bear-

ing piles is 12,550 feet. Testimony was received that only 9,535 feet were driven. Government Exhibit No. 12 shows an underrun in steel sheet piling of 35 tons. There are several points which prevent this situation from falling within the changed conditions categories. Drawing No. 7–2–1, which has the title of "PILING PLAN AND DETAILS REACTOR AREA" provides that the pile points given on the drawing were for bidding purposes only. In connection with the bearing pile, it was clearly understood and provided for in the specifications that new driving criteria would be established following the pile load tests, and in this respect the Government was clearly exercising its prerogatives under the contract. This appears to be a common practice in pile driving work, the purpose being to obtain additional information not reflected by the boring logs. Two expert witnesses offered by Appellant testified that it was difficult to predict from boring data the length piling should be. One of those experts stated that it was difficult to predict from the boring data driving conditions. Subsection 8–10f clearly provides for establishing, as a result of the control tests, new driving methods and final penetration for the piles.

With respect to the sheet piling, Section 8 of the contract provided that the piling should be driven into rock where called for on the drawings and to depth shown in other locations. The provision goes on to recite that the Construction Engineer (a subordinate of the Contracting Officer) may direct a greater depth than assumed rock elevation where necessary or lesser depths in which case adjustments in the contract price would be made as provided by the specifications. Acting pursuant to that authority, the Construction Engineer directed that where the sheet piling was driving 25 blows to the inch, provided there were 5 feet of toe-in below the adjacent excavation, hammering could stop as such depth would be acceptable to the Government. This directive occurred in late June 1963.

In the Contracting Officer's advice to Appellant establishing the new criteria, Appellant argues that the language used "Recent observations of your pile driving operations indicate that due to site conditions certain changes in the procedure required by the contract are desirable" is an acknowledgement of changed conditions. That argument is not tenable. Site conditions were the only reason for establishing a new and different criteria for penetration and method of driving. But those conditions need not be judged, because of the language used, as changed conditions.

\* \* \* \* \* \*

Plaintiff assails the Board's foregoing interpretation of the June 28, 1963, directive and the letter of August 5, 1963 (referred to by the Board as the Contracting Officer's advice). The essence of plaintiff's position is that the specifications proved to be inaccurate because refusal by the piles was met at a higher elevation than indicated in the specifications, that the defendant's directive and letter constituted recognition "that the site conditions were so difficult that the requirements of the Specifications literally could not be met," and that this was an admission of a changed condition.

A reading of the contract documents "from the four corners" confirms the validity of the Board's interpretation and the conclusions it reached in connection with the aforementioned directive and letter. Ambrose-Augusterfer Corp. v. United States, 394 F.2d 536, 184 Ct.Cl. 18 (1968). From the contract documents as a whole it is clear that plaintiff, as a bidder, was on notice that the elevations indicated were subject to the subsequent establishment of new criteria and/or elevations, for both the bearing piles and sheet piles. It is equally clear that the contract documents put plaintiff, as a bidder, on notice that it would be driving piles into rocky formation,

and that it actually did so although generally to a lesser depth than initially indicated. It cannot be concluded that the physical conditions at the site differed materially from those indicated in the contract, within the meaning of the first clause of the changed conditions article, or that plaintiff encountered, within the meaning of the second clause of the article, "unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract." Perini Corp. v. United States, supra; James H. Clack v. United States, 395 F.2d 773, 184 Ct.Cl. 40 (1968).

## EQUITABLE ADJUSTMENT

In its decision, the Board stated:

The final decision of the Contracting Officer, out of which this appeal arises, awarded to Appellant the sum of $6,619, as an equitable addition to the contract price. The decision recites that it is designated as Change Order No. 7. The order has as its basis the "Changes" clause (Article 3 of the General Provisions of the contract). At the hearing, the Government offered in evidence a document identified and received as Government's Exhibit No. 11, which is a breakdown of the equitable addition to the contract price. This document was offered by the Government's estimator who had prepared the adjustment figure. The Government's exhibit reveals that the contractor was awarded 120 hours additional driving time which amounted (labor and material) to $10,800, and the sum of $2,500 for driving an additional test pile, plus $864 for insurance and welfare. From the aggregate awarded the contractor, a credit for the underrun of the piling was subtracted. To the balance was added overhead, profit, social security, and commission, leaving a net balance to Appellant of $6,619.

Testimony was offered by the estimator that he had erred in providing payment for an additional test pile. It is undisputed that only three test piles were driven and only three required to be driven under the terms of the contract, but until he heard testimony on the subject at the hearing, the witness was under the erroneous impression that a fourth pile had been driven by the Appellant.

The Board finds that this was a bona fide error, and the amount of the addition to the contract made under Change Order No. 7 should be reduced by $2,500, plus applicable percentages for insurance and welfare, overhead, profit, social security, and commission.

The witness further testified that based on the testimony he heard during the course of the hearing, Appellant was not entitled to the 120 hours additional driving time which had been awarded him by Change Order No. 7. This testimony of the witness is a bare conclusion unsupported by factual evidence, and no weight is given it by the Board. Accordingly, there is nothing in the record to indicate that the Contracting Officer's determination with respect to the 120-hour additional driving time is in error. That ruling of the Contracting Officer is sustained.

The Board perceives further error in computations set forth in Government's Exhibit No. 11. This relates to the computation of credits for the underrun. Subsection 8–04 of the specifications sets forth, as indicated earlier, the manner in which an adjustment in contract price is to be made in the event of an underrun in piling. For the first 10 percent of underrun in bearing piling "Deduct per linear foot, for decrease in the total linear footage $2.00." This unit price applied only to the first 10 percent of the underrun. For underrun in excess of 10 percent, the subsection states that an equitable adjustment shall be made. On sheet piling, for the first 10 percent of underrun "Deduct per ton for decrease in the total weight $130." Here also the unit price applied only to the first 10 percent of the underrun. For under-

run in excess of 10 percent an equitable adjustment is called for. Government's Exhibit 11 discloses that this specification formula was not followed. It appears that the estimator calculated the whole of the underrun (both bearing and sheet piling) at the rate provided for the first 10 percent deviation in quantities.

Government's Exhibit No. 12 offered and received in evidence was prepared by the same estimator during the course of the oral proceedings. It is set forth in pertinent part:

"Allow credit for Piling underrun in accordance with Specifications, $2.00/LF for H. Beams, $130.00 ton for Sheeting, balance to be negotiated.

*H. Beams*

| | |
|---|---|
| Contract | 12,550 LF |
| Less in Place | −9,535 LF |
| Underrun | 3,014 LF = 24% [sic] |
| 10% | −1,255 LF |
| To be Negotiated | 1,759 LF |

$1,759 \times 74 \#/LF = 130,166$ lbs. $= 65$ ton $\pm$

*Sheet Piling*

| | |
|---|---|
| Contract | 196 tons |
| In Place | −161 tons |
| Underrun | 35 tons |
| 10% | − 20 tons |
| To be Negotiated | 15 tons + 65 ton H. Beams = 80 ton |

*Summary*

| | |
|---|---|
| 1,255 LF "H." Beams (a) $2.00/LF | $2,510.00 |
| 20 Ton Sheet Piling (a) $130.00/ton | 2,600.00 |
| 80 Ton Scrap (a) $10.00 | 800.00 |
| Total Credit | $5,910.00" |

It will be noted that no provision is made for the 120-hour additional driving time shown on Government's Exhibit No. 11. The amount of underrun for both bearing and sheet piling appears to be undisputed. The estimator's computations shown on Government's Exhibit No. 12 partially complies with Subsection 8–04 in that underruns up to 10 percent are calculated correctly. The amount over 10 percent has been characterized by the estimator as 80 tons of scrap at $10 per ton. The 80 tons represent the amount subject to equitable adjustment. The record is not sufficient for this Board to make a finding as to the equity to which each party is entitled on the underrun exceeding 10 percent. Accordingly, this aspect of the matter is remanded to the Contracting Officer for resolution not inconsistent with this opinion.

At the oral hearing, Appellant objected strenuously [sic] to the admission of the evidence with respect to Government's Exhibit No. 12. The Board finds, however, that its admis-

sion was proper under the principle that if the parties fail to agree on price adjustment, as in the instant case, the dispute must be decided under the "Disputes" clause of the contract (Article 6 of the General Provisions). Here there is a bona fide factual dispute, falling within the Board's jurisdiction, regarding the amount of compensation due Appellant. The Board rules that the taking of this appeal, which conferred jurisdiction on the Board, opens up the entire case, and the Board may consider, under the "Disputes" clause, any error that may come to its notice whether or not raised by the parties to the dispute.

▆▆▆ Plaintiff's major objection to the Board's opinion and decision on the above equitable adjustment is that the Board considered "that portion of the Contracting Officer's Decision from which no appeal was taken." The short answer to this objection, however, is that in its notice of appeal, to the Board, dated October 7, 1964, plaintiff stated that it was appealing from the September 8, 1964, decision of the contracting officer in which the "Contractor claims that the Contracting Officer owes the Contractor the sum of $165,988.67, as an equitable adjustment to the Contract" and in which the "Contracting Officer admits that it owes the sum of $6,619.00 and denies liability for any additional sum." It thus is apparent that the whole subject matter of the contracting officer's decision was brought before the Board by plaintiff's appeal. The Board was, of course, entitled to examine the matter de novo.

Davis v. United States, 180 Ct.Cl. 20 (1967). Plaintiff also expresses a minor objection to the Board's application of the specification provision regarding a deviation in excess of 10 percent of the underrun in piling. A fair reading of the specification establishes, however, that the Board's application of the specification is correct, namely, that the unit price applies only to the first 10 percent underrun and that for the underrun in excess of 10 percent, an equitable adjustment is called for.

## BOARD PROCEEDINGS

Plaintiff alleges that the Board decision is arbitrary, capricious and violative of due process in several particulars, hereinafter considered.

▆▆ (1) Denial of Discovery—The Board denied plaintiff's motion for the production of documents, on the ground that the motion was defective in that there was no showing that the documents existed and that there was no showing of relevancy. The Board also denied plaintiff's motion for the production of laboratory tests made by or on behalf of the contracting officer. The denial was based upon the uncontroverted allegation in the response of Government counsel that the laboratory tests sought by plaintiff were not made by, or on behalf of the contracting officer or any other officer or employee of defendant, and that the tests were the confidential property of a non-governmental agency and, therefore, were not official records in the custody of defendant.[4] Plaintiff has not estab-

4. Rule 7C of the General Services Administration Board of Contract Appeals, November 2, 1964, reads:

"C. *Discovery*.

"(1) Upon written motion filed with the Board, appellant may move for access to official records in the custody of the General Services Administration for the inspection or production of records, not privileged, which constitute or contain evidence regarding any matter which is relevant to the subject matter involved in the appeal.

"(2) The motion shall identify with reasonable particularity the document de-

sired and in what respect it is relevant to the issues of the case in terms of discovery. No record furnished in response to a motion shall become evidence until offered and received in evidence. Motions for an order of discovery shall be filed with the Board prior to oral hearing.

"(3) Privileged records are those (a) relating solely to internal management, (b) confidential by law, (c) security classified, and (d) whose release is otherwise not in the public interest.

"(4) Records, as used herein, include, but are not limited to, documents, papers, books, and letters."

lished that the above denials by the Board constituted an abuse of discretion, and has cited no authority indicating that such denials were violative of due process. Robertson Elec. Co. v. United States, 176 Ct.Cl. 1287, 1296 (1966).

(2) Examination of Contracting Officer—In his opening statement at the hearing before the Board, plaintiff's counsel stated that if defendant's counsel "does not call the Contracting Officer personally as a witness, we would like the opportunity as a part of our case in rebuttal to call him as an adverse witness." Defendant did not call the contracting officer as a witness and at the conclusion of its case, defendant's counsel stated that he had no intention of calling him. Plaintiff's counsel then moved for judgment on the pleadings, "on the ground that the opposite party, namely, the contracting officer, who is readily available, declines to testify." In overruling the motion, the presiding Board member announced that the Board did not have subpoena power and could not call witnesses either for the Government or for the contractor.

 In this court, plaintiff asserts that "the denial of the right of confrontation and cross-examination of the adverse party in an action is violative of plaintiff's due process rights." Plaintiff has not related the proposition which it states to the facts of this case and has not cited any authority to support its contention; nor has plaintiff shown that its case was prejudiced by lack of opportunity to examine the contracting officer. J. D. Hedin Constr. Co., Inc. v. United States, 408 F.2d 424, 187 Ct.Cl. 45 (1969). Plaintiff has not, moreover,

demonstrated that it made independent efforts to secure the appearance of the contracting officer. Kaers v. United States, 175 Ct.Cl. 111 (1966); Begendorf v. United States, 340 F.2d 362, 169 Ct.Cl. 293 (1965).

(3) Refusal to Swear Witnesses— In opening the hearings, the presiding Board member stated:

\* \* \* \* \* \*

We do not swear witnesses. But I wish to call your attention to the Board Rule 14, which provides that "The statements of a witness may be subject to the provisions of Title XVIII, U.S.Code, Sections 287 and 1001, and any other provisions of law imposing penalties for knowingly making false representation in connection with claims against the United States.

\* \* \* \* \* \*

Plaintiff's counsel then requested that all witnesses be sworn. The presiding Board member replied:

\* \* \* \* \* \*

As to the swearing of witnesses, the Board has determined that it does not have authority to swear witnesses. We are not vested with any statutory power. Therefore, we will not swear witnesses.

\* \* \* \* \* \*

 Plaintiff asserts that the refusal to swear the witnesses was a denial of due process, and that "a hearing at which witnesses are under no sanction of law to be truthful is a sham." Plaintiff has cited no case and none has been found in which an administrative proceeding has been vitiated solely because of failure to swear the witnesses.[5] In-

---

5. Plaintiff does not contend that the failure to swear the witnesses was a violation of the regulations. Rules 12 and 13 of the Board read:

"12. *Nature of hearings.*

"Hearings will be as informal as reasonably permissible, and will seek to provide the Board with the pertinent facts and the positions of the parties as a basis for the Board's decision or recommendation. The parties may offer such relevant evidence or argument as they deem appro-

priate, subject, however, to the exercise of reasonable discretion by the presiding member of the Board in supervising the extent and manner of presenting such evidence. The weight to be attached to any evidence presented will be determined by the Board.

"13. *Examination of witnesses.*

"Witnesses will not be required to testify under oath. However, if circumstances so warrant, the presiding Board member may warn the witness that his statements

deed, this court has clearly stated that administrative hearings need not be cast in the mold of court proceedings. *J. D. Hedin Constr. Co. v. United States, supra*; *Peters v. United States*, 408 F.2d 719, 187 Ct.Cl. 63 (1969); *Prater v. United States*, 172 Ct.Cl. 608 (1965).

■ (4) Unequal Treatment of Witnesses—Plaintiff complains that "the Board applied one standard to Defendant's witnesses and another standard to Plaintiff's witnesses" because the statute to which the presiding Board member alluded in the above quoted statement (making it a crime for knowingly making false representation in connection with claims against the Government) would not deter defendant's witnesses who were obviously not making a claim against the Government. Plaintiff's complaint, though ingenious, is manifestly without substance.

(5) Violation of GSA Regulations— Plaintiff contends that the decision was rendered in violation of GSA regulations because "the administrative record herein shows no assignment of this case to a panel." Plaintiff cites the Preface to the Rules which read:

\* \* \* \* \* \*

(b) The Board consists of a Chairman and four to six other members, in addition to clerical personnel. At least three members of the Board must be trained in the law. *In general, the appeals are assigned to a panel of at least three members of the Board. The decision of a majority of the panel constitutes the decision of the Board.* Each panel shall have one member who is a graduate of an accredited law school or has equivalent legal training and experience. The Chairman is the

administrative head of the Board but otherwise serves on an equal status with other members. [Emphasis supplied.]

■ Assuming that the Preface to the Rules has the same status as the Rules themselves, it is clear that there was not any such violation as contended by plaintiff. In the first place, the language of the Preface does not purport to prescribe an assignment in every instance. Moreover, accompanying defendant's motion for summary judgment is an uncontroverted affidavit by the presiding Board member that the instant case was assigned to Panel 9 which consisted of three Board members. The Board decision was signed by two members of the panel. *Sternberger v. United States*, 401 F.2d 1012, 185 Ct.Cl. 528 (1968); *Sundstrand Turbo v. United States*, 389 F.2d 406, 182 Ct.Cl. 31 (1968); *Radiation Technology, Inc. v. United States*, 366 F.2d 1003, 177 Ct.Cl. 227 (1966).

■ (6) Failure to Find Facts— Plaintiff correctly points out that the Board opinion comprised "a mixture of findings of fact, rationale and conclusions," but a fair reading of the opinion compels the judgment that it contains all of the factual conclusions essential to support its decision, and, therefore, is not invalid or devoid of the proper factual basis. *Clack v. United States, supra*.

## CONCLUSION

Since plaintiff has not proven a case for recovery, defendant's motion for summary judgment is granted, plaintiff's motion for summary judgment is denied, and plaintiff's petition is dismissed.

may be subject to the provisions of Title 18, U.S.C., secs. 287, 1001, and any other provisions of law imposing penalties for knowingly making false representations in connection with claims against the United States or in any matter within the jurisdiction of any department or agency thereof."