The **BOEING COMPANY**

v.

The **UNITED STATES.**

No. 429–70.

United States Court of Claims.

June 20, 1973.

Harold F. Olsen, Seattle, Wash., attorney of record for plaintiff. Bruce Michael Cross, and Perkins, Coie, Stone, Olsen & Williams, Seattle, Wash., of counsel.

M. Morton Weinstein, Washington, D. C., with whom was Asst. Atty. Gen., Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

PER CURIAM:

This is a review case under the Wunderlich Act, 41 U.S.C. §§ 321–22. Plaintiff manufactures aircraft, missiles, space vehicles and other products; both for the United States and for private customers. Often its Government contracts are of the cost-reimbursement type. The parties being at odds as to the allocability and allowability of various state and local taxes assessed upon the plaintiff, the contracting officer on

August 5, 1966, rendered a single consolidated decision applicable, it is said, to 146 contracts. His position was adverse to Boeing's on all points now before us. Boeing appealed to the Armed Services Board of Contract Appeals, which on September 5, 1969, rendered a decision, favorable to Boeing, except that it held with respect to a group of contracts subject to Revision No. 11 to the 1960 edition of ASPR (Armed Services Procurement Regulations), i. e., subparagraph (v) of ASPR 15–205.41(a) (Appendix III), personal property taxes on commercial (nongovernment) inventory were unallowable for allocation to that group, because the cited regulation provided, it held, to the contrary. 69–2 BCA ¶ 7898 (1969). It reaffirmed this decision on May 26, 1970, overruling a Government motion for reconsideration. 70–1 BCA ¶ 8298 (1970).

Plaintiff's petition here alleges legal errors in the portion of the Board decision unfavorable to it. Defendant's answer and counterclaim alleges legal errors in the portions of the Board decision favorable to Boeing. There is no dispute as to the facts. Chief Trial Commissioner Richard Gamer has considered the briefs and arguments of counsel and has submitted an opinion and recommended conclusion of law under Rule 166(c). The court having considered requests for review thereof by both parties, and having heard oral argument, agrees with the commissioner's opinion and adopts the same as its own, with modifications not affecting the result.

The larger part of the commissioner's opinion deals with the portion of the Board decision favorable to defendant, and demonstrates that it is correct and should be affirmed. We agree. It would be superfluous to add anything to what the commissioner says or to the able findings and analysis of the Board, and we do not do so.

At its conclusion, the commissioner's opinion summarizes the issues which the Board decided in Boeing's favor, but recommends no decision by us. He would hold this court unable to review a Board decision favorable to a contractor for legal error, lack of support in substantial evidence, and whether arbitrary or capricious, citing S & E Contractors, Inc. v. United States, 406 U.S. 1, 92 S. Ct. 1411, 31 L.Ed.2d 658 (1972). However, we deem it unnecessary to resolve these questions here. The parties have fully briefed and argued the Board decision in its entirety, as much the portions holding for defendant, as those for plaintiff. The Board's carefully considered and thorough findings and opinion on all issues are their own best argument for their correctness as a matter of law. We are unanimous that defendant has stated no case on the merits against the Board decision, and this being so, we are in a position to let more water go over the dam, before we oblige defendant by trying to resolve its and our own uncertainties about the Wunderlich Act and the S & E decision. Assuming arguendo that we have the full power defendant urges, we agree even so with the Board and hold that defendant is not entitled to have it reversed. Monett v. United States, 419 F.2d 434, 190 Ct.Cl. 1 (1969), cert. denied, 400 U.S. 846, 91 S.Ct. 91, 27 L.Ed.2d 82 (1970).

During the years involved, 1960 to 1964, Boeing had several divisions engaged in different segments of its vast enterprises. In its accounting, Boeing treated all involved state and local taxes as applicable to Boeing, not its divisions, accumulated them in a Headquarters Administrative pool, and charged them back to the divisions on a labor-hours basis. Defendant's complaint was and is that this threw a disproportionate load of tax costs on certain divisions, notably the Aerospace Division, that were heavy users of manpower and that produced primarily for the Government. Defendant said that almost all state and local taxes could be attributed directly to the divisions that incurred them in course of their operations, and to do so would re-

duce defendant's cost reimbursement obligations by many millions over the years involved.

The Board, rejecting defendant's argument, relied largely on our decision, Lockheed Aircraft Corp. v. United States, 375 F.2d 786, 179 Ct.Cl. 545 (1967), and on ASPR § XV, particularly 15–201–4 (Appendix II), both of which sanctioned a "benefit theory" to allocate debatable indirect expense. (The applicable regulations changed from time to time, but for present purposes it is unnecessary to trace all their variations.) The "benefit" it supposed to be related to the number of employees in that the taxes support many activities, such as schools, which require support in order to provide a civilized environment for Boeing's employees. In *Lockheed* we called "benefit" an "extremely slippery concept" but said no one "would quarrel with the general proposition that it is fair to allocate to government contracts the costs of services which facilitate performance of the particular contracts or are essential to the existence and continuance of the business entity." 375 F.2d at 794–795, 179 Ct.Cl. at 558, 561. The Board was also of the opinion, with record support, that Boeing's method of allocation accorded with generally accepted accounting principles, as the regulations also required, though defendant denied this.

The above is inadequate even as a summary of the intricate skein of fact and law that makes up this case, but it is wasteful of print and paper for us to duplicate the Board decision on this issue in its entirety, and we do not do so. Those wishing the full details can read the Board decision. It suffices to add that the Board decision is, in our opinion, clearly correct as an exposition of the applicable law, in the portions of it which are adverse to defendant as much as in the portions that are in defendant's favor. It would avail defendant nothing for us to take jurisdiction of its counterclaim for Wunderlich Act review.

Commissioner Gamer's opinion is modified by eliminating the brief closing portion which discusses the defendant's counterclaim and the legal effect of the *S & E* decision.

Accordingly, plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is denied. The petition is dismissed. Defendant's counterclaim is dismissed.

Commissioner Gamer's opinion, as modified by the Court, follows:

Plaintiff is a manufacturer of aircraft and such other products as missiles and space vehicles.

In the 1960–1964 period it made sales to the Government under numerous contracts which provided that its costs of manufacturing the products would be reimbursed (sometimes referred to as "cost-plus-fixed-fee" (CPFF) contracts). The parties herein are in dispute concerning the proper amount of plaintiff's overhead costs which is allocable to its performance of such cost reimbursable contracts.

The dispute narrows down to the propriety of plaintiff's including in such overhead, as an alleged item of indirect cost of performing its Government contracts, a portion of the property taxes assessed by the State of Washington and its local political subdivisions on such personal property as inventories of materials, tooling, and work-in-process which were being used only in the performance of non-Government, commercial contracts (such property sometimes being collectively referred to as commercial inventory or property). Although such State and local taxes were not imposed during such period on personal property used in the fulfillment of Government contracts, plaintiff seeks to allocate to its costs of performing such contracts a portion of the taxes assessed on the commercial property. The particular taxes involved were those assessed on the commercial property located in plaintiff's plants in the areas of Seattle, and closely adjoining Renton, Washing-

ton. In these plants plaintiff manufactured during the years in question both military and commercial products.

All of the contracts here involved incorporated by reference the applicable provisions of Part 2, Section XV of the Armed Services Procurement Regulations (ASPR) in effect at the time the contracts were executed. These provisions related to cost principles for determining the reimbursability to the contractor of costs on cost-reimbursement type contracts.

For various reasons, the contracting officer disallowed all the overhead costs plaintiff claimed which represented portions of the taxes assessed on its commercial property. On appeal to the Armed Services Board of Contract Appeals, the contracting officer was reversed with respect to certain Government contracts but sustained as to others.[1] In this case, plaintiff contests, under the Wunderlich Act,[2] the decision of the Board insofar as it disallows such costs (the claim amounting to over $650,000), while defendant, by a counterclaim, seeks reversal of the decision insofar as it permits their allowance.

In Lockheed Aircraft Corp. v. United States, 375 F.2d 786, 179 Ct.Cl. 545 (1967), the court held that the aircraft manufacturer there involved could, in calculating costs incurred in performing fixed-price incentive contracts,[3] include in its overhead chargeable thereto a portion of its state and local taxes assessed against its commercial inventories and work-in-process. Although, unlike the situation in the contracts here involved,

Section XV of the Armed Services Procurement Regulations in existence at the time the Lockheed contracts were entered into was not made a part of such contracts, the court nevertheless did examine, for guidance in construing the contracts, a subsequently adopted version of such section which became effective on November 2, 1959, describing it as "a composite of sound accounting rules" (375 F.2d at 793, 179 Ct.Cl. at 557). Emphasizing that "[t]he criterion in the ASPR for allocating indirect costs is 'benefit'" (375 F.2d at 793, 179 Ct.Cl. at 558), the court held that the payment of the taxes on the commercial inventory resulted in benefits flowing to the Government contracts,[4] and that a portion of such taxes was therefore chargeable, on a properly allocable basis, to such contracts.

After the adoption of the November 2, 1959 version of Section XV of the Procurement Regulations (but prior to the court's Lockheed decision), there was disagreement between members of the aerospace industry and officials of the defendant, particularly those of the Air Force, concerning the proper interpretation of the section and the propriety of allowing, as costs of a Government contract, an appropriate portion of taxes on property used solely in connection with work on non-Government contracts. There was, in addition, some confusion and lack of uniformity in the handling of such tax item even within the Government establishment. Accordingly, Section XV was amended by the Department of Defense in an effort to make

---

1. ASBCA No. 11866, 69-2 BCA ¶ 7898 (1969), decision affirmed on Motion for Reconsideration, 70-1 BCA ¶ 8298 (1970).

2. 68 Stat. 81 (1954), 41 U.S.C. §§ 321-22 (1970).

3. Although termed "fixed-price," the "incentive" nature of the contracts required, in calculating a final contract price, that final costs would be computed and compared with the "target" costs so that "incentive sharing adjustments" and final profits could be calculated.

4. "In a general way, they [the Government contracts] were benefited by the very fact that Lockheed was meeting its responsibilities as a corporate citizen in the Burbank community. Specifically, they were benefited by the services provided by the community." 375 F.2d at 796, 179 Ct.Cl. at 562-563. The community services which the personal property tax supported included water and sewage, fire and police protection, health services, traffic and air pollution control, coroner and library.

clear the Department's policy on the matter. The amendment was included in Revision No. 11, dated September 30, 1962, which made several amendments to the Armed Services Procurement Regulations. The particular amendment in question took the form of a new paragraph ("(v)") to a "Taxes" subsection (15–205.41(a)) of Section XV.[5] The November 2, 1959 version of Section XV provided in Section 15.201.2 that, in determining "the allowability ·of individual items of cost," the factors of "reasonableness," "allocability," "generally accepted accounting principles and practices," and "any limitations or exclusions set forth in this Part 2 * * *" were to be considered. It also provided, in Section 15–201.4, that a cost would be allocable to a contract (a) "in accordance with the relative benefits received or other equitable relationships"; (b) if it benefited both the Government contract as well as other work the contractor was performing "and can be distrib-

uted to them in reasonable proportion to the benefits received"; and (c) it was "necessary to the overall operation of the business." [6] And specifically as to taxes, the version provided in Section 15–205.41(a), that "[i]n general" taxes which the contractor was required to pay were allowable costs chargeable to Government contracts. Four exceptions were, however, set forth, i. e., (1) Federal income and excess profits taxes; (2) taxes paid in connection with the contractor's financing operations; (3) taxes from which exemptions were available to the contractor based in turn on exemptions afforded the Federal Government; and (4) special land assessments representing capital improvements.[7] The amendment to the paragraph added to the "Taxes" subsection 15–205.41(a) by Revision 11 set forth a fifth exception, as follows:

(v) taxes on any category of property which is used solely in connection with work other than on Government

5. 27 Fed.Reg. 11643, 11644 (Nov. 27, 1962).

6. These particular provisions read in full as follows:
"15–201.2. *Factors Affecting Allowability of Costs.* Factors to be considered in determining the allowability of individual items of cost include (i) reasonableness, (ii) allocability, (iii) application of those generally accepted accounting principles and practices appropriate to the particular circumstances, and (iv) any limitations or exclusions set forth in this Part 2, or otherwise included in the contract as to types or amounts of cost items.
 * * * * *
"15–201.4. *Definition of Allocability.* A cost is allocable if it is assignable or chargeable to a particular cost objective, such as a contract, product, product line, process, or class of customer or activity, in accordance with the relative benefits received or other equitable relationship. Subject to the foregoing, a cost is allocable to a Government contract if it
(i) is incurred specifically for the contract;
(ii) benefits both the contract and other work, or both Government work and other work, and can be distributed to them in reasonable proportion to the benefits received; or

(iii) is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown."

7. These provisions read in full as follows:
"15–205.41 *Taxes.*
(a) Taxes are charges levied by Federal, State, or local governments. They do not include fines and penalties except as otherwise provided herein. In general, taxes (including State and local income taxes) which the contractor is required to pay and which are paid or accrued in accordance with generally accepted accounting principles are allowable, except for:
(i) Federal income and excess profits taxes;
(ii) taxes in connection with financing, refinancing or refunding operations (see ASPR 15–205.17);
(iii) taxes from which exemptions are available to the contractor directly or available to the contractor based on an exemption afforded the Government except when the contracting officer determines that the administrative burden incident to obtaining the exemption outweighs the corresponding benefits accruing to the Government; and
(iv) special assessments on land which represent capital improvements."

contracts. (Taxes on property used solely in connection with either non-Government or Government work should be considered directly applicable to the respective category of work unless the amounts involved are insignificant or comparable results would otherwise be obtained; e. g., taxes on contractor-owned work-in-process which is used solely in connection with non-Government work should be allocated to such work and taxes on contractor-owned work-in-process inventory, and Government-owned work-in-process inventory when taxed, used solely in connection with Government work should be charged to such work.)

The Board concluded that, with respect to all the cost-reimbursement type contracts entered into by plaintiff which were subject to the provisions of Part 2, Section XV of the Procurement Regulations in effect prior to the adoption of Revision 11 dated September 30, 1962, plaintiff was entitled to recover. As to such contracts subject to the Regulation in effect after November 2, 1959, and prior to September 30, 1962—the period with which the court was concerned in *Lockheed*—the Board held that this court's decision in *Lockheed* was controlling and that "the personal property taxes on commercial inventory assessed and paid in connection with the group of contracts subject to the ASPR provisions [effective November 2, 1959] are properly allocable to Government contracts * * *." And as to the contracts subject to the Regulation in effect prior to November 2, 1959, the Board concluded that the version of the Regulation then in existence contained no provisions "requiring a conclusion as to the allowability of these taxes contrary to that reached by the Court in *Lockheed.*"

The Board's conclusion as to the contracts subject to the provisions of Part 2, Section XV, as amended September 30, 1962 by Revision No. 11, was, however, different. As to these contracts, the Board held that the "limitation set forth" in the amendment "expressly prohibits the *allowance* of 'taxes on any category of property which is used solely in connection with work other than on Government contracts,'" and requires that such taxes "should be considered directly applicable" to such "category of work." It concluded that:

> * * * Unquestionably, Revision No. 11 was intended to and does preclude the allowance of the personal property taxes on commercial inventory involved in this appeal under those contracts which are * * * subject to the terms of that revision. The application of this limitation was understood by industry generally and the appellant in particular from its inception. * * * Any other interpretation would ignore the clear requirements of 15–201.2(iv).[8] (69–2 BCA ¶ 7898 (1969), p. 36,749.)

As stated, plaintiff complains about the disallowance with respect to such group of contracts. It contends that the Board erred in construing the amended "Taxes" subsection as mandating such a result. Its argument is as follows: Despite the addition of the fifth exception to Section 15–205.41(a) effected by the amendment, the balance of Section XV, with its criterion of "benefit," remains unaltered so that the "benefit" concept and test, which the court applied in *Lockheed*, persists. Since the introductory part of paragraph (a) of the "Taxes" section 15–205.41 similarly continues to state that: "In general, taxes * * * which the contractor is required to pay * * * are allowable * * *,"[9] the entire subsection should be construed, plaintiff contends, as only a "general" guide, with the allowability of particular tax costs to be determined by the provisions of Section XV as a

8. E. g., The provision making allowability of costs subject to "any limitations or exclusions set forth in this Part 2 * * *." Fn. 6.

9. Fn. 7.

whole. Construing the amendment as effecting an absolute prohibition against the allowance of personal property taxes on commercial inventory as a cost of performing a Government contract results, plaintiff maintains, in conflict between the "basic criterion of benefit specified in ASPR" and the amendment (Pl. Brief. p. 15), an interpretation which should be avoided. On the other hand, plaintiff says, an interpretation which would leave room for discretion in the contracting officer within the "general" guidelines specified, and which would still permit allowance based on the criterion of "benefit," would be reasonable and proper. "At best" plaintiff argues, the "language [of the amendment]"—with its reference to taxes " 'in general' being 'allowable except for * * taxes [on commercial inventory]' is ambiguous," (id.) and must therefore be construed in plaintiff's favor.[10] Accordingly, plaintiff maintains that the Board erred in interpreting Section XV, as amended, as dictating the disallowance of the taxes in question.

Further, the structure of the above-mentioned Section 15–201.2, which sets forth the *Factors Affecting Allowability of Costs*," is relied upon as support. As shown, such section states that four factors are to be considered in determining allowability of cost items, i. e., reasonableness, allocability, generally accepted accounting principles and "any

limitations or exclusions set forth in this Part 2." The proper interpretation of these provisions, says plaintiff, is that "the limitations or exclusions of [the Taxes Section] 15–205 are only one of the factors to be considered in determining the allowability of individual items of cost" and that no "limitation in 15–205 is mandatory, conclusive and must be followed without deviation." (Pl. Brief p. 17).

Similarly, parts of still another section—15–204, headed *"Application of Principles and Procedures"* [11]—also indicate, plaintiff maintains, that the exclusions specified in Section 15–205, upon which the Board relied, are not mandatory. For instance, such Section 15–204, after providing, in subparagraph (a), that "[c]osts, shall be allowed to the extent that they are reasonable * * * allocable * * * and * * * allowable in view of the other factors set forth in 15–201.2 and 15–205," goes on to state that such "criteria apply to all of the selected items of cost which follow, notwithstanding that particular guidance is provided in connection with certain specific items for emphasis or clarity." Reliance is also placed on subparagraph (c) of the section which, after stating that "[s]elected items of cost are treated in 15–205," continues with the provision that the "determination of allowability" of "all items" of cost "shall be based on the principles and standards

10. Plaintiff also points to the "Notes Regarding Substantive Changes" which the Department of Defense published with Revision No. 11 and the statement therein regarding the amendment to Section 15–205.41 requiring "generally the application of direct costing of certain property taxes applicable to inventories used solely on (i) Government work and (ii) non-Government work."

11. "15–204 *Application of Principles and Procedures*. (a) Costs shall be allowed to the extent that they are reasonable (see ASPR 15–201.3), allocable (see ASPR 15–201.4), and determined to be allowable in view of the other factors set forth in ASPR 15–201.2 and 15–205. These criteria apply to all of the selected items of

cost which follow, notwithstanding that particular guidance is provided in connection with certain specific items for emphasis or clarity.
  (b) * * *
  (c) Selected items of cost are treated in ASPR 15–205. However, ASPR 15–205 does not cover every element of cost and every situation that might arise in a particular case. Failure to treat any item of cost in ASPR 15–205 is not intended to imply that it is either allowable or unallowable. With respect to all items, whether or not specifically covered, determination of allowability shall be based on the principles and standards set forth in this Part and, where appropriate, the treatment of similar or related selected items."

set forth in this Part * * *." The use of the word "guidance" in subparagraph (a) shows, says plaintiff, that "the discussions of particular items of cost in Section 15–205 are guides only"; that "Section 15–205.41(a) in particular is a *general* guide only"; and that "Section 15–205 must therefore be applied in the context of ASPR as a whole," i. e., on the basic criterion of "benefit." (Pl. Brief p. 18.)

Furthermore, argues plaintiff, the very amendment itself upon which the Board relied should not be construed as constituting an explicit exception to allowability because, unlike the subparagraphs of 15–205.4 which constitute "straight-forward disallowances," the parenthetical statements in subparagraph (v) "shows that the subsection is merely an accounting instruction as to the method by which [the commercial inventory tax] costs are to be allocated." (Pl. Brief p. 19.) The reference to "comparable results" in the subparagraph is further indication, plaintiff maintains, that "[t]he draftsmen recognized they were dealing with an allocation problem and not an allowability problem." (Pl. Brief pp. 19–20.)

■ None of these contentions can be accepted. The Board's interpretation, which is clearly correct, resolves no "ambiguity" nor creates any "conflict." The amendment of Section 15–205.41(a) plainly prohibits the allowance of personal property taxes on commercial inventory as a cost of performing a Government contract. The provision that "[i]n general, taxes * * * are allowable, *except for* * * * taxes on any category of property which is used solely in connection with work other than on Government contracts," (emphasis supplied) is not reasonably susceptible to any other interpretation. The parenthetical explanation and examples directly following to the effect that taxes on property "used solely in connection with either non-Government or Government work should be considered directly

applicable to the respective category of work * * * " further unambiguously emphasizes the point. It is true that Section 15–201.4, headed "*Definition of Allocability*," does provide that "a cost is allocable * * * in accordance with the relative benefits received or other equitable relationship" and "if it * * * (ii) benefits both the contract and other work, or both Government work and other work, and can be distributed to them in reasonable proportion to the benefits received; or (iii) is necessary to the overall operation of the business, although a direct relationship to any particular cost objective cannot be shown." [12] Nevertheless, all of these provisions are subject to the prior Section 15–201.2, headed "*Factors Affecting Allowability of Costs*," which includes "any limitations or exclusions set forth in this Part 2 * * * " as to types or amounts of cost items. The "limitation" or "exclusion" set forth in the amendment to Section 15–205.41(a) is, as stated, a flat prohibition against the allowance, as a Government contract cost, of personal property taxes on commercial inventory. Plainly the "exception" or "exclusion" does not in this instance create any "conflict" or an "ambiguity."

Nor can such "*Factors Affecting Allowability*" Section 15–201.2 reasonably be construed as making the exclusion simply one factor to be considered together with the others enumerated, such as "reasonableness." This section makes plain that to be allowable, a cost must meet all the criteria set forth therein, including "any limitations or exclusions set forth in this Part 2." If it is, by another portion of Part 2 of the Regulation, specifically made unallowable as a cost, that ends the matter. Plaintiff's interpretation—that a flat exclusion of a particular cost is only one factor to be considered in determining whether the cost is in fact to be excluded—could lead to the anomalous result of a complete negation of such flat exclusion.

12. Fn. 6.

Full scope is afforded to the introductory words "In general" in Section 15–205.41(a), upon which plaintiff places such emphasis, by the subsequent limited dispensations permitted in the prohibitions against the allowance of certain taxes. For instance, with respect to taxes concerning which an exemption is available to the contractor, either directly or by reason of an exemption afforded the Government, the prohibition against charging the Government therewith is waived if "[t]he contracting officer determines that the administrative burden incident to obtaining the exemption outweighs the corresponding benefits accruing to the Government." Similarly, with respect to taxes on commercial inventory, the requirement of direct costing is waived if "the amounts involved are insignificant or comparable results would otherwise be obtained * * *."

Nor is there substance to the contention that the "guidance" and other general language of the *Application of Principles and Procedures* Section 15–204 upon which plaintiff relies, makes possible the disregard of the specific prohibition of the particular cost item effected by the amendment to Section 15–205. Such Section 15–204 specifically provides that its provisions as to allowability are subject to the "other factors set forth in ASPR * * * 15–205." One of the factors so set forth in 15–205 is nonallowability of the personal property taxes on commercial inventory. And the provision that the allowability of "all items" of cost "shall be based on the principles and standards set forth in this Part" necessarily includes the specific determination of the amendment to Section 15–205—also a part of such Part 2—that the personal property taxes in question are not allowable. The general provisions of such Section 15–204 upon which plaintiff relies cannot possibly be interpreted as permitting the allowance of an item that Section 15–205 in terms excludes.

Finally, there is no merit to the argument that the amendment in question constitutes only "an accounting instruction" with respect to allocation and that it does not constitute an allowability exclusion. In providing that "[t]axes are allowable, except" taxes on commercial inventory, an exception to allowability is manifestly involved. The parenthetical dispensation in instances where "the amounts involved are insignificant or comparable results would otherwise be obtained" does not serve to weaken this conclusion, even though, in determining whether a dispensation situation exists, questions of allocability may arise.

In effect, the court in *Lockheed* decided the very issue here involved. In interpreting a version of the Procurement Regulations in effect during a period pertinent to that case, the court also examined the subsequently amended version of Section 15–205.41(a) which is herein involved and concluded that "[Lockheed] would have to concede * * * that *in 1962 a revision was made to disallow as a government contract cost precisely the kind of tax involved here.*" 375 F.2d at 792, 179 Ct. Cl. at 555. (Emphasis supplied.) And in a second *Lockheed Aircraft Corp.* case, 426 F.2d 322, 192 Ct.Cl. 36 (1970), described by the court as "a follow-up" of the previous case, the court refused to apply such amended version of Section XV to a contract entered into prior to the date the amendment was adopted so as to preclude such allowance, stating: "We do not sense any intimation that the 1962 regulation was intended to be retroactive with respect to a contract already performed." 426 F.2d at 328, 192 Ct.Cl. at 47. As shown, however, with respect to the group of contracts here involved, there is no issue of retroactivity because the contracts specifically incorporated the then applicable version of Section XV which contained the amendment.

Plaintiff attacks the Board's finding that "the application of this limitation [the amendment to Section 15–205.41(a) effected by Revision 11] was understood by industry generally and the appellant in particular from its inception."

The finding as to plaintiff's knowledge is based upon a letter from plaintiff's counsel to the General Counsel of the Air Force. The letter was dated November 5, 1962—about a month after the adoption of Revision 11 on September 30, 1962—and was concerned with the allowability, as a cost of performing certain contracts, of an allocable portion of the cost of personal property taxes on work-in-process and special tooling owned by plaintiff but used solely in the performance of non-Government contracts. All of the contracts were entered into prior to the date of Revision 11. The letter argued for an interpretation of such prior version that would permit such allowance, plaintiff's counsel pointedly observing that "it is pertinent to note that personal property taxes on work in process and special tooling were not listed as an exception prior to Revision 11 to ASPR dated September 30, 1962." And the letter went on to state that: "Although ASPR apparently has now been changed to provide for contrary treatment for CPFF contracts, we believe this change should not have been made and was made as a result of a misunderstanding by the ASPR committee of the accounting treatment currently being accorded such taxes by most Government contractors. As you know we are endeavoring to persuade the ASPR committee to reverse its position in this regard."

The finding as to industry knowledge is based on two letters from the Aerospace Industries Association of America, Inc. (of which plaintiff is a member), one dated October 12, 1962 to the Chairman of the ASPR Committee of the Department of Defense, and the other dated November 21, 1962 to the Assistant Secretary of Defense. The first letter protested the Revision 11 change to Section 15-205.41 which would "require that property taxes on any category of property which is used solely in connection with work other than on Government contracts be allocated to such work * * * without regard * * * to the accounting treatment which would normally be accorded any such taxes under a contractor's established accounting procedures" and "strongly recommend[ed] that such" change "be rescinded." The second letter too complained that the amendment to the Section served to "disallow as costs of performing Government contracts any taxes assessed by state and local Governments on property used in connection with commercial work," noted that "[t]his is a departure from long standing practice * * *," and sought an opportunity to present "further reasons why it should be withdrawn." [13]

■■ It thus seems clear that the Board's finding was well grounded and that plaintiff should, therefore, be held to the plain terms of the contracts it chose to enter into and seemingly clearly understood. However, even if plaintiff's understanding of the meaning and effect of the amendment was in fact not as clear as its contemporaneous statements would indicate, or even if, as it here contends, its reading of Revision 11 then actually was as it now urges the proper interpretation of the Revision to be, it would make no difference. This is so because, as hereinabove found, the terms of Section XV, as amended by the Revision, so plainly foreclosed the allowance of the taxes in question. The rule of construction against the party who drafted the document is premised upon the existence of a reasonable ambiguity and the proffer by the other party of a reasonable alternative interpretation. Martin Lane Co. v. United States, 432 F.2d 1013, 193 Ct.Cl. 203 (1970). Here, neither condition exists.

---

13. Coupled with the complaint about the amendment to Section 15–205.41 was one about an amendment to Section 11.401–2 also effected by Revision 11 (27 Fed.Reg. at p. 11,660). This amendment specifically permitted the use of a clause in negotiated contracts providing "for the exclusion of a specific tax from the contract price" and requiring that the contracting officer make certain "that the contract price does not include taxes not allocable under § 15.205–41(a) of this chapter."

Thus, while the interpretation of the contracts (i. e. Section XV of the Regulations which was incorporated in the contracts) is a question of law which the court itself is free to resolve, nevertheless, based upon an independent consideration of plaintiff's contentions, it is plain that the Board's resolution of the interpretation dispute was proper.

Plaintiff further argues that, even if its contention concerning the proper construction of Section XV as amended is rejected, it nevertheless is still entitled to recover because it qualifies for one of the exceptions specified in the amendment to Section 15–205.41(a). As indicated, the amendment excluded the taxes in question as reimbursable contract costs "unless the amounts involved are insignificant or comparable results would otherwise be obtained." Plaintiff says it proved that its situation properly falls within the "comparable results" exception and that the Board, in rejecting such proof, acted arbitrarily and capriciously.

Plaintiff's contention is that during the 1960–64 years here in question it properly allocated all of its items of overhead cost, including the tax costs here involved, between Government and non-Government business on the basis of benefits received even if they could be "identified to," or were "caused solely by," or would not be incurred "but for" each type of business. As to the tax item in question, plaintiff's method was sustained by this court in the *Lockheed* cases. However, if that method is now to be discarded insofar as the one overhead item of personal property taxes on commercial inventory is concerned and the item instead directly costed, then it would be appropriate, says plaintiff, to ascertain what the result would be were all of its overhead accounts to be similarly treated and directly costed, where possible, using the described bases for such costing. Accordingly, plaintiff prepared for the one year 1963 a huge accounting study [14] designed to show that,

had plaintiff during such year made direct charges to the respective Government and commercial categories of its Seattle-Renton work susceptible to such charging on the mentioned bases—referred to in the study by the shorthand term of "Government unique" or "Commercial unique"—instead of handling such items on its customary benefit-allocation basis, the Government contracts would for such one year alone have been charged with a total of $1,601,000 more in costs. This savings to the Government for this sample year alone, says plaintiff, fully qualifies plaintiff for the "comparable results" exemption. The savings resulted principally from the fact that, by individual analysis, plaintiff concluded that there were 88 "Examples of Overhead Functions Which were Peculiar and/or Disproportionate to Government Work" while there were only five that were "Peculiar and/or Disproportionate to Commercial Work." Accordingly, says plaintiff, the application of the principles of direct costing would have caused greater total net costs to be charged to the Government contracts than under plaintiff's regular accounting system. Thus, although $1,336,000 in personal property taxes on commercial inventory for such year would be shifted from the cost of performing Government contracts to commercial contract costs, when all the overhead items of cost in the study are considered and the cost shifts made as indicated therein, a net increase of $1,601,-000 in charges to Government contracts would, according to the study, result.

The study was introduced in evidence through the testimony of plaintiff's Controller at the Board hearing held in September 1968. He testified that the "approach" made for the study in determining whether the selected items of overhead should be considered as "Government unique" or "Commercial unique" (or common to both and therefore to be allocated instead of directly costed) "is obviously one of judgment and evalua-

14. Admitted in evidence before the Board as Appellant's Exhibit No. V.

tion"; that it was "based on a study to-day looking back in the time period that the costs were incurred" (Bd. tr. p. 63); that this was actually not the way the company had kept its books and that consequently the "whole study is on a hypothetical basis" (*id.* p. 149); that "[f]or Government work versus non-Government work, and any attempt to account for it in that manner would require considerable expansion of our overall system" (*id.* p. 63); that there might well be a "substantial amount of additional disagreement between the company representatives and the [Government] auditors as to the portion of each of the functions or efforts involved that should be charged in this fashion to Government versus Commercial work" (*id.* p. 64); and that actually "it would be most difficult to segment and fragmentize our overhead to a point of going into this kind of detail" (*id.* p. 142). As to the tax item in question, however, he admitted that there was no such difficulty and that "we can readily identify that element as assessed." (*Id.*).

The Government's witness, a supervisory auditor employed by the Defense Contract Audit Agency who reviewed the study, was critical of it in many respects. For instance, he considered an "Engineering Expense" item of $2,587,000 charged as a "military" expense to be erroneous since it included an "SST [supersonic transport airplane] Bid Proposal" of $2,246,000. He disputed that such bid proposal cost was "a proper charge to Government contracts and only Government contracts in the year 1963" since in his opinion, it should have been considered at that time as "a new business type cost" chargeable "both to Government and commercial work." He testified that "the supersonic airplane is not a Government airplane, it is an airplane which is to be sold to Boeing's commercial customers," and that "[w]e feel that the benefits accruing to the company would be more to the commercial program than they would be to Government." (*Id.* 443). A reversal of this one item alone, he testified, would serve to nullify "what this particular study is intended to show." (*Id.*).[15] He similarly criticized the fact that, as to certain finance costs totaling $3,726,000, the study assumed that 20 percent thereof, or $745,000, were costs "unique to the Government" while no part of such total costs was considered "as unique to the commercial airplane program" despite the fact that they were all incurred in plaintiff's commercial airplane division "where the commercial airplanes are being built." (*Id.* 445). He similarly criticized the study's assumption of 50 percent of the security and guard costs as "Government unique," while there were "none shown as unique to the commercial programs" although "I know that better than 70 percent of the business at the commercial airplane division was commercial." (*Id.* 447–448). After similarly criticizing other items, he concluded that, if proper adjustments were made only in the few items he mentioned, "the effect on the total schedule here would be that instead of the Government contracts bearing a million six hundred thousand dollars more than they would as Boeing had booked them, they would have been charged about a million six hundred thousand dollars less, that the reverse would have taken place." (*Id.* 499).

■■ Considering the record relating thereto, the Board rejected the study as a basis for concluding that the taxes in question should be allowed as contract costs under the "comparable results" exception contained in the amendment to Section 15–205.41(a). It stated that:

    * * * the Government raised serious questions affecting the results, pointing out that the various elements of costs which the appellant sought to assign as wholly within the sphere of Governmental activities or business could, with equal reason, be allocated

15. In rebuttal, plaintiff pointed out that the SST expenditures were made pursuant to a Government contract.

to a greater degree within the zone of various commercial activities, which, together with the arbitrary percentage allocations, distorted the results, affecting the net amounts by a sizable margin. (Tr. 442–449.) In view of the hypothetical character of the study, the limited period involved, the questionable validity of the allocations used by the appellant, and the fact that Boeing's normal accounting practices were not utilized, the Board cannot accept either the results or the conclusions therein. [69–2 BCA ¶ 7898, p. 36,744.]

In view of the testimony before it, and the admitted nature of the exhibit, the Board's conclusion cannot be held, as urged by plaintiff, to be "arbitrary, capricious and not supported by substantial evidence." Certainly plaintiff errs in stating that the Board's finding "is supported by no evidence whatsoever because the Government submitted no evidence." (Pl. Br. p. 25.) The complaint that defendant presented no evidence is valid only in the sense that it did not itself prepare or present anything in the nature of a "study" affirmatively addressed to the "comparable result" question. But there was no obligation imposed on defendant to do so. It was up to plaintiff to carry its burden of proof. If the quality of its evidence was shown by defendant's testimony or otherwise to be deficient, the Board was not obligated to accept it simply because it constituted the only "evidence" on the matter. Sternberger v. United States, 401 F.2d 1012, 185 Ct.Cl. 528 (1968).[16]

Plaintiff makes yet another attack upon the disallowance of the taxes in question as a contract cost. It contends that if the proper interpretation of Section 15–205.41(a) as amended does require such disallowance, then it must follow that the Secretary of Defense exceeded his authority in issuing the amendment and that the section is, therefore, invalid as a matter of law. The Board rejected the contention. Here again, independent consideration of this question of law results in the same conclusion as that arrived at by the Board.

■■ The first ground upon which plaintiff's contention is based is that Revision 11 of the Procurement Regulations insofar as it amended Section 15–205.41(a) so as to effect the disallowance of the commercial inventory taxes, is invalid because it is inconsistent with the Armed Forces Procurement Act of 1947 (now codified in 10 U.S.C. §§ 2301–2314 (1970)). The alleged inconsistency is based upon the fact that one of the purposes of the Act was, as indicated in the House Report on the bill which became the Act, to afford "an equal opportunity to all suppliers to compete for and share in the government business."[17] Plaintiff contends that the amendment at issue contravenes such purpose because it discriminates between contractors competing for Government business in that contractors operating in states which assess personal property taxes on commercial inventories are disadvantaged by not being able to allocate any part of such taxes to

16. "[Plaintiff] has failed to show that the evidence which it presented and which the Board rejected was either uncontradicted or, more important, substantial in the sense of deserving of weight or acceptance. The fact alone that the government presented no witnesses does not make plaintiff's evidence compelling or substantial. The testimony said to have been rejected as uncontradicted was in part contradicted, and in part self-contradictory. The witness in question was moreover an expert giving opinion testimony. Even uncontradicted opinion testimony is not conclusive if it

is intrinsically nonpersuasive. * * * . Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted nonopinion testimony." 401 F.2d at 1016, 185 Ct.Cl. at 535–536.

17. H.Rep.No.109, March 10, 1947, 80th Cong. 1st Sess., 6. Also see on the same bill (H.R. 1366) S.Rep.No.571, July 16, 1947, 80th Cong. 2d Sess., 2 U.S.Code Cong.Service 1948, p. 1048 in which such statement from the House Report is quoted at 1049.

their Government contracts while others operating in states which raise their revenue by means of other kinds of taxes not excluded under the Regulations, but which use such revenue for the same purposes as those for which the inventory taxes are used by the states assessing them, are allowed to allocate a portion thereof to their Government contracts. Thus, says plaintiff, "[b]y disallowing the personal property tax on inventories, subsection (v) of ASPR 15–205.41(a) is placing contractors like Boeing at a serious competitive disadvantage as compared to contractors located in states which raise their revenue by other taxes. * * * By creating this competitive handicap, the Board's construction denies Boeing and other contractors similarly situated an equal opportunity to compete and is contrary to the Congressional intent." (Pl. Br. p. 29).

Even assuming, despite plaintiff's specific agreement (resulting from the incorporation of Section XV as amended into its contracts) to the disallowance of the taxes in question as a reimbursable contract cost, that it is open to plaintiff to contest such portion of its contracts by attacking the validity of the Regulations (see Rough Diamond Company v. United States, 351 F.2d 636, 173 Ct.Cl. 15 (1965), cert. denied, 383 U.S. 957, 86 S.Ct. 1221, 16 L.Ed.2d 300 (1966) ), plaintiff's contention must nevertheless be rejected. There is nothing in the Armed Services Procurement Act which specifically prevents a regulation which would serve to disallow a personal property tax on commercial inventories from being charged as a cost to reimbursable-type Government contracts.[18] The Act permits cost-plus-a-fixed-fee and incentive contracts to be made if the head of the agency "determines that such a contract is likely to be less costly to the United States than any other kind of contract." 10 U.S.C. § 2306(c) (1970). The adoption of reasonable regulations relating to cost allowances is therefore certainly within the ambit of the Act's provisions.[19] In promulgating a regulation that a certain type of state tax (from which the Government is immunized) should not be charged to the cost of a Government reimbursement-type contract, the agency head is hardly acting unreasonably or outside the scope of the confines of an Act which is directly concerned with such costs. The fact that, as a matter of policy, others may disagree with the wisdom of a regulation does not serve to make it invalid. Port Authority of St. Paul v. United States, 432 F.2d 455, 458, 193 Ct.Cl. 108, 115 (1970). Where there is a "broad congressional grant of administrative authority to prescribe rules and regulations to effectuate the provisions of the Act * * * our scope of review is

---

18. Revision 11 recites that it was issued pursuant to the authority of 10 U.S.C. § 2202 (which is not the Procurement Act statute). This statute reads as follows:

"Notwithstanding any other provision of law, an officer or agency of the Department of Defense may obligate funds for procuring, producing, warehousing, or distributing supplies, or for related functions of supply management, only under regulations prescribed by the Secretary of Defense. The purpose of this section is to achieve the efficient, economical, and practical operation of an integrated supply system to meet the needs of the military departments without duplicate or overlapping operations or functions."

However, the Revision also cites Defense Department Directive 4105.30, dated March 11, 1959 (24 Fed.Reg. 2260) as its authority for issuance. This Directive is entitled "Armed Services Procurement Regulation." Its stated purpose is the continuation of such regulation of the Department of Defense and of the Secretary under 10 U.S.C. § 2202. The Board stated that "It has been generally recognized that the ASPR is also issued in consonance with the procurement authority granted in the Armed Services Procurement Act. See Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963)." [69–2 BCA ¶ 7898, p. 36,750].

19. Immediately preceding the quotation from the H.Rep. on the Armed Services Procurement Act upon which plaintiff relies is the statement that the proposed bill "assures the Government of fair and reasonable prices for the supplies and services procured."

limited. * * * [t]his court * * * can invalidate such a regulation only if it clearly contradicts the terms or purposes of the statute." (*Id.*)

■ The allegation that the Regulation is invalid because it is arbitrarily discriminatory and therefore unreasonable—advanced as the second ground of alleged invalidity, but obviously related to the first—is based only upon the possible incidental effect produced by the various forms of revenue raising devices used by the 50 states and their political subdivisions. This is too remote and speculative a ground upon which to base such a charge. "Affording an equal opportunity to all suppliers to compete for and share in the Government business" cannot fairly be construed to mean that Government procurement policies must be dependent upon a meticulous study of the variable cost situations of contractors operating in all 50 states resulting from the differences in the tax structures of the states and their political subdivisions, and how such structures may conceivably (taking into consideration the contractors' accounting systems) affect the contractors' costs on its Government contracts. Generally, local state laws are not permitted to shape Federal procurement policy. Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). The particular location in which a contractor chooses to do business necessarily affects not only his various tax costs but also a myriad of other cost factors. Considering only the Regulation itself, and not the speculative, incidental, effects it may have upon contractors in the 50 states, it is difficult to perceive "discrimination" in a regulation which, with respect to a certain type of tax, treats all contractors alike vis-a-vis their Government contracts.[20]

The third ground upon which plaintiff rests its invalidity contention is that the Department of Defense issued the amendment prohibiting the allocation to Government contracts of commercial inventory taxes under a mistaken notion of what it was doing. The Department, says plaintiff, construed the prior version of Section 15–201.4 as requiring that such taxes be charged solely to the contractor's commercial work, and issued the amendment simply to clarify such interpretation and to eliminate some confusion even among its own auditors on the point.[21] Plaintiff points out,

---

20. The alleged competitive disadvantage is centered in large part upon the contractor's commercial business (if it has any) for it is such business that would have to bear the cost of taxes on commercial inventories. As the Board put it, plaintiff's contention "would use the issue of *incidental commercial disadvantage* arising out of the vagaries in the taxing policies of the numerous state and local authorities as a basis for imposing upon the Government a requirement that its procurement policies issued under the authority of 10 U.S.C., §§ 2202 and 2304 et seq., must conform to the tax policies of local jurisdictions and thereby subordinate federal procurement regulations to local policies. * * * " (Emphasis supplied.)

Considering the numerous situations in which contractors may find themselves under the tax structures of the various states, conditions may be hypothesized under which a contractor would be "discriminated" against under the previous version of Section XV. As the Assistant Secretary of Defense, Installations and Logistics, stated in a letter of March 8, 1963 to the Aerospace Industries Association in defending the new amendment: "The equities of the matter support the ASPR revision. Suppose Company A has in some locality a plant that does a certain volume of commercial work and an equal volume of Government work. Suppose Company B has a plant across the street that does the same volume of the same kind of commercial work but no Government work. Roughly the same amount of property taxes would be assessed against the commercial work of both companies. But, if your Association's argument were adopted, Company A would be allowed to allocate half of such taxes to Government contracts and thus gain a significant advantage as to commercial sales over Company B." (Folder IV, Supplemental Rule 4 Documents, tab 6, p. 2).

21. Plaintiff points to the letter dated March 8, 1963, written by the Assistant Secre-

however, that the Department was, as shown by the subsequent *Lockheed* cases, mistaken as to such construction. Accordingly plaintiff argues, " * * * the revision * * * was not a confirmation of prior practice but rather a reversal" thereof. It therefore follows, according to plaintiff, that "the amendment was issued on an incorrect assumption about the underlying facts and must be regarded as invalid." The Department should, it says "not be allowed to change a rule unconsciously." (Pl. Br. p. 36.)

This contention is not acceptable. Whether the Department turned out to be right or wrong about its interpretation of the regulation in its prior form is plainly immaterial, since it was obviously the Department's desire to have the taxes in question disallowed as a contract cost whether or not the Revision 11 promulgation with respect thereto was considered as a "clarification" or a "change." Indeed, considering its obvious strong feelings about the matter, it is wholly plain that, had it realized its interpretation of the prior version was erroneous, it would not only have promulgated the identical amendment anyway but would have done so—to plaintiff's disadvantage—with even greater diligence. In a situation such as the instant one, a cost exclusion effected by amendment is clearly not subject to invalidation simply because a court deter-

mines at a later date that, without the exclusory amendment, the cost was allowable.

Finally, plaintiff argues that if Section 15–205.41(a) as amended is interpreted to mandate the commercial inventory tax disallowance as a Government contract cost, it is unconstitutional. The contention is again based upon the alleged discriminatory effect of the amendment which plaintiff asserts amounts to a violation of the due process clause of the Fifth Amendment.[22]

Again assuming that, despite the incorporation in plaintiff's contracts of Revision 11, with its specific exclusion provisions contained therein, it is open to plaintiff to raise this constitutional question, it is nevertheless manifest that the contention has no merit. As hereinabove shown there is no such "discrimination" as would warrant holding the regulation invalid as unreasonable and arbitrary. For the same reasons no violation of the Fifth Amendment is perceivable.

## CONCLUSION

In accordance with the above, plaintiff is not entitled to recover on its claim, defendant is not entitled to recover on its counterclaim, the parties' cross motions for summary judgment are denied and plaintiff's petition and defendant's counterclaim are dismissed.

---

tary of Defense to the Aerospace Industries Association (fn. 20) in which the Assistant Secretary stated: "In our judgment, ASPR 15–201.4 clearly requires the allocation of taxes on categories of property used solely for commercial work to that work. The recent changes in ASPR 11–401.2 and 15–205.41 were necessary simply because ASPR 15–201.4 was not being applied correctly in some cases." (*Id.* p. 3).

22. The following dictum in Taylor v. United States, 320 F.2d 843, 846 (9th

Cir. 1963), cert. denied 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964) is relied on:

"[A]lthough due process and equal protection are not always interchangeable phrases, discriminatory federal action may be so unjustifiable as to be violative of Fifth Amendment due process. The test, insofar as federal action is concerned, is whether the alleged discriminatory feature is reasonably related to any proper governmental objective."